### STATE *vs.* JONAS C. MAINE.

The easement enjoyed by the public in a turnpike road is vested in the public as much as that of a common highway.

The resumption by the sovereign power of the franchise of a turnpike company leaves the easement of the public in the road, disburthened of the tolls, but otherwise unaffected.

The land owners are presumed to have received full compensation for this permanent easement when the land was taken.

Where, therefore, the legislature passed a resolution repealing the charter of a turnpike company, discontinuing the road as a turnpike, and establishing it as a public highway, it was held that the road became a legal public highway, without any new assessment of damages to the owners of the soil.

INFORMATION against the defendant for a nuisance in obstructing a highway. It was claimed in defense that the place obstructed was not a highway.

The highway claimed had formerly been a part of the turnpike road of the Hop River Turnpike Company. The charter of this company was repealed by the General Assembly in the year 1851, by the following resolution:

" *Resolved,* That the act of incorporation of the Hop River Turnpike Company be, and the same is hereby repealed; and the road belonging to said company, [describing its route,] shall be and remain a common or public highway, to be hereafter maintained or discontinued by said towns in the same manner as if the said highway had been originally laid out by the selectmen of said towns according to the provisions of the statute law of this state, in such case made and provided. Provided, that this resolution shall be void and of no effect, if either of the aforesaid towns shall, in a town meeting legally warned and held for that purpose, within sixty days after the rising of this assembly, by a major vote disapprove of the provisions herein contained."

In the year 1853 the General Assembly passed a further resolution discontinuing the road as a turnpike road, and providing that it should thereafter " be and remain a part of the public highway in said towns, to be maintained and treated in all respects as public convenience and necessity require, in the same manner as though said road had been originally laid out and made by said towns, according to the provisions of the statute laws of the state, in such cases made and provided."

The defendant was the owner of the land over which the turnpike was originally laid, at the place obstructed, and claimed to hold the same, after the discontinuance of the road as a turnpike, disburthened of the public easement; and upon the trial requested the court to charge the jury that by such discontinuance and the repeal of the charter of the turnpike company, the public use for which the land had been taken terminated, and that in order to establish a new highway as a substitute for the turnpike road, it was neces-

sary to take the land anew, and make compensation therefor in the same manner as in the original laying out of a high-way.

The court charged the jury that it was competent for the legislature, when it repealed the charter of the company, to provide for a continuance of the easement which it had created, independently of the franchise of the company, and to further provide for a reparation of the road by the towns in which it was located, in the manner and to the extent that it did by the acts of 1851 and 1853, and without any other or further taking or assessment; and that if, in point of fact, the road was continued and maintained by the towns and used by the public as a highway, pursuant to said resolves, to the time when the obstructions were placed upon it, it was a public highway within the meaning of the statute.

The jury found the defendant guilty, and he moved for a new trial.

*L. F. Robinson*, in support of the motion, contended that the public have properly no easement in a turnpike road—that the franchise of a turnpike company gives it the right to take the land for their road and to permit the public to pass over it on paying toll—that the whole right of the public is to pass on paying toll, like the right to pass by railroad on paying the fare—that the land is taken solely for the purposes of the turnpike company—and that, by the repeal of the charter of the company, all the rights of every kind created by the charter, or coming incidentally into existence under it, instantly cease, and the land becomes at once disburthened of the incumbrance resting upon it; also, that if the legisla-ture attempts to establish a public highway in the place of the turnpike road thus discontinued, it can do it, under the provision of the constitution of the state which forbids the taking of private property for public use without compensa-tion, only by treating the land as taken anew, and having damages therefor assessed in favor of the owners of the soil; citing *Imlay* v. *Union Branch R. R. Co.*, 26 Conn., 249; *Williams* v. *Central R. R. Co.*, 16 N. York, 97; *Mifflin* v.

*Railroad Co.*, 16 Penn. S. R., 182; *State* v. *Johnson*, 11 Ired., 647 ; *Nicholson* v. *N. York & N. Haven R. R. Co.*, 22 Conn., 85; and Ang. on Highways, § 326.

*Brockway* and *Loomis*, contra, contended that it was competent for the legislature, on discontinuing a turnpike road, to continue it as a public highway—that this had been done very frequently in this state, and the right to do it never before called in question—that the public have an easement in a turnpike road, and as permanent an easement as in a common highway—that the land had been originally taken for *public use* and could lawfully have been taken for no other use, and that full compensation had been made for a permanent public easement when it was taken—that in converting the turnpike road into a common highway no new damage was done to the owners of the soil, and no new burden was imposed, but the servitude continued, so far as the public use was concerned, the same precisely as before—and that the cases in which it had been held that the appropriation of the soil of a highway to the use of a railroad company was the imposition of a new servitude, had no application to the present case, because the use of the highway for the purpose of a railroad was a use not contemplated when the land was taken, and was essentially different from, and often inconsistent with, its use as a highway, and was an additional burden upon the land and a new damage to the owners of the soil; citing Ang. on Highways, §§ 9, 111; *Commonwealth* v. *Wilkinson*, 16 Pick., 175; *Murray* v. *Commissioners of Berkshire County*, 12 Met., 456; *Chase* v. *Sutton Manufacturing Co.*, 4 Cush., 152, 157; and *Chagrin Falls Plank Road Co.* v. *Cane*, 2 Ohio S. R., 419.

SANFORD, J. The defendant in this case, admitting that he erected the obstructions complained of, seeks to justify the act as the absolute owner of the land on which they were placed, and claims that the resolutions of the General Assembly of 1851 and 1853, in so far as they purport to authorize the continuance of the road as a public highway

after its discontinuance as a turnpike, were unconstitutional and void, because, in effect, they attempted the establishment of a new highway, while they provided no compensation for the owners of the land over which it passed.

What reason existed for the passing of the act of 1853 is not very apparent, but is unimportant, because, in regard to the question before us, the two acts are substantially the same.

Other questions, subordinate to the one alluded to, seem to have been made upon the trial and are presented on the record, but, as they have not been insisted upon in this court, we pass them with the remark, that we see no reason to dissent from the opinion expressed by the judge upon the trial regarding them.

It is too obvious to require the remark, that it never was the intention of the legislature, by the act of 1851, or that of 1853, first to discontinue the turnpike road and extinguish the easement, and then to create a new highway in its stead. All the provisions of each of these acts, respectively, were intended to go into operation at the same instant of time— exonerating the corporation from a liability which, at the same instant, devolved upon the towns, to maintain the road; the existence of the easement remaining unaffected by the change. So that the question is one regarding the real character of the easement created when the turnpike road was established, and the power of the legislature in this way to provide for its continuance and support.

The power of the legislature, or of any court or other authority known to our institutions, to establish roads for public use over the lands of individuals without providing for them adequate compensation, has not been and can not be successfully claimed. The people, in whom the sovereign power resides, have not delegated such authority or power, but, on the contrary, have in express terms prohibited its exercise. Constitution of Conn., Art. 1, § 11. And while, on the one hand, the due and legal establishment of a turnpike road, under the charter of the Hop River Turnpike Company, has not been denied by the defendant, so on

the other, the imposition of a new servitude upon the defendant's land, by the establishment of a new highway after the discontinuance of the old one, has not been asserted by the prosecutor. It is, however, claimed by the defendant, that if the resolutions under consideration are valid acts, such must be their legal operation, because, it is said, that although the public use of the turnpike road was contemplated and intended, subject to the payment of the tolls specified in the charter, yet the easement was created for, and vested in, the turnpike corporation, and that the dissolution of the corporation of necessity extinguished the easement also. We do not accede to this proposition.

A road constructed and supported by a turnpike corporation differs in no essential characteristic from a common highway, established and supported by a town, a borough, or a city. Their origin and objects are identical. Both emanate from the same supreme power, acting through the legislature, the courts, or other depositaries of authority designated by the laws. Both are called into existence, and supported, to subserve, in exactly the same way, the public necessities and convenience, and both alike are intended to endure for an indefinite period, and so long as that convenience requires or that necessity exists. The funds for making and repairing them, indeed, are drawn from different sources and in different modes—the one, from travelers by a toll—the other, from the community by a tax; and the turnpike company is permitted to take, for the benefit of its stockholders, the contingent profits in compensation for the contingent losses of the enterprise; but still the public interest in the road and the burden upon the land are essentially the same in both. And hence, the charters of most of the turnpike companies in the state provide, as in the case of the Hop River Turnpike Company, that the road shall be laid out only after it shall have been ascertained upon inquiry, and decided, that public convenience and necessity require such road; and that, after the cost of making and keeping the road in repair, with interest at a rate prescribed, shall have been reimbursed to the turnpike company, not, that the

easement shall be extinguished, the road discontinued, and the land disburdened, but, that the road shall be discharged from toll altogether, or except so much as the General Assembly or the court shall order to keep the road in repair. 2 Private Acts, 1204, *et seq.* Hence, too, some of the turnpike companies are permitted to take and use, as part of their roads and subject to their tolls, portions of old highways, made and paid for by the towns, without remuneration to the towns or compensation to the individual owners of the land, and to appropriate to their use and subject to their tolls, bridges, not only erected but supported also by the towns. And hence, too, in many instances, the charter in express terms declares that such turnpike roads, laid out under such charters, "shall be established as public highways." 2 Priv. Acts, 1200, &c. And special acts of the General Assembly have been deemed necessary, and have been passed, to authorize and give validity to release deeds from turnpike companies to the proprietors of the land, and to make such deeds effectual for the extinguishment of the public right of way over the land released. 2 Priv. Acts, 1215, &c. Thus the understanding of the legislature, that the easement in a turnpike road, as well as in a common highway, is vested in the public, notwithstanding the construction and support of such road is committed to a turnpike corporation, seems clearly manifested.

Private statutes like those under consideration, affecting the interests of many towns and great numbers of individuals, have from year to year been enacted by the legislature, the constitutionality of which has never, until now, been questioned in our courts. 4 Priv. Acts, 1288, *et seq.* It is true, that neither the practice of the legislature nor the acquiescence of the people, however long or uniform, can give validity to a private or a public statute which is repugnant to any of the provisions of the constitution, and in a clear case of such repugnancy this court will never hesitate to declare such statute void. But such practice and acquiescence may well admonish us to examine well the ground we stand upon, when by such determination we are to come in

conflict with the legislative power. In the resolutions or private statutes now under consideration, we discover no such repugnancy.

Similar views in relation to this subject seem to be entertained by the supreme court in Massachusetts. Thus, in *The Commonwealth* v. *Wilkinson*, 16 Pick., 175, Ch. J. Shaw says: "We think a turnpike road is a public highway, established by public authority, and is to be regarded as a public easement. The only difference between this and a common highway is, that instead of being made at the public expense in the first instance, it is authorized and laid out by the public authority, and made at the expense of individuals in the first instance, and the cost of construction and maintenance is reimbursed by a toll levied by public authority for the purpose."

Again, in *Murray* v. *Berkshire County Commissioners*, 12 Met., 458, the same learned judge says: "A turnpike road is a public highway, which all the people have a right to use, and which no one has a right to obstruct, not even the corporation that built it, except so far as they are expressly authorized by law to do so in order to secure the tolls granted them." "On no other ground would the legislature be justified in exercising the public right of eminent domain, by authorizing the taking of private property for laying out a turnpike.

It was said by the counsel for the defendant, that in the case of *Murray* v. *Berkshire County Commissioners*, supra, the court recognized the idea that damages may accrue to the land owner by the conversion of a turnpike road into a common highway; and it is true that the legislature of Massachusetts, in the enactment of a general law authorizing such conversion in the mode specified in the act, provides that, in the assessment of damages, there shall be allowed to persons injured by such change, such damages as they would be justly entitled to receive, beyond the damages that would have been sustained by the same persons by the continuance of the road as a turnpike road, and no more; and the Chief Justice, in the case last mentioned, remarks that in general such change will occasion no damage to the private owner,

but may often be a benefit to him, but that, if it should cause him any additional damage, the statute allows it to him. And afterwards, in *Chase* v. *The Sutton Manufacturing Company*, 4 Cush., 168, the same judge said, that the provision of the act then under consideration, was " founded on a principle which has been decided in this commonwealth and is now well settled, that where under the authority of the legislature, in virtue of the sovereign power of eminent domain, private property has been taken for a public use, and a full compensation for a perpetual easement in land has been paid to the owner thereof, and afterwards the land is appropriated to a public use of the like kind, as when a turnpike has been by law converted into a common highway, no new claim for compensation can be sustained by the owner of the land over which it passes."

In the case before us, the way was an easement belonging to the public, for whose use it was created, and the privilege of collecting tolls upon it a franchise vested in the turnpike corporation. The resumption of the franchise by the sovereign power, left the easement disburdened of the tolls, but otherwise unaffected, and, in the language of the resolutions, " to be *and remain* part of the public highway in the respective towns in which it ·is situated, to be maintained and treated in all respects as public convenience and necessity require, in the same manner as though said road had been originally laid out and made by said towns," &c. For this easement, originally contemplated as perpetual, and estimated accordingly, the land owners must be presumed to have received their compensation at the time the road was laid. The claim of the defendant, therefore, for further compensation, has no foundation either in justice or in law.

Of the constitutional power of the legislature to pass the resolutions under consideration, we entertain no doubt.

The adjudications cited by the counsel, regarding the right of railroad companies to locate their roads on highways without making compensation to the owners of the land, are inapplicable to the case before us, because of the obvious and essential difference between a railway and a turnpike or

common road, in respect both to the manner of its use and the inconvenience and consequent damage to the ordinary travel and to the private land owner by such use—a diversity so great as to render the two uses almost, if not altogether, inconsistent with each other. *Springfield* v. *Conn. River R. R. Co.*, 4 Cush., 63. *Williams* v. *N. Y. Central R. R. Co.*, 16 N. York, 110. *Imlay* v. *Union Branch R. R. Co.*, 26 Conn., 249.

We do not advise a new trial.

In this opinion the other judges concurred.

New trial not advised.