146 APRIL, 1897.

Canastota Knife Co. *v.* Newington Tramway Co. et al.    Vol. 69

## THE CANASTOTA KNIFE COMPANY *vs.* THE NEWINGTON TRAMWAY COMPANY ET AL.

First Judicial District, Hartford, January Term, 1897. ANDREWS, C. J., TORRANCE, FENN, BALDWIN and HAMERSLEY, Js.

The location of an electric railway in a public highway does not impose an additional servitude upon the soil for which the owner of the fee can demand compensation, unless the mode of its construction or operation be such as to make it a substantial impediment to public travel, or a proximate cause of special damage of a new description to the owner of the soil.   (*Two judges dissenting.*)

But the construction of any kind of a railway in a highway the soil of which belongs in fee to the adjoining proprietors, is a trespass upon their land, unless such construction has been duly authorized by law.

The route over which a street railway company is authorized to build by its charter, is an entirety, and should it threaten to construct its railway over a route materially deviating in line and purpose from that prescribed, although part of it may be within the charter limits, it may be restrained in a suit by a proprietor of the fee in a highway embraced within that part, from entering on his soil in the prosecution of its unlawful design.

[Argued January 7th and 26th — decided April 6th, 1897.]

SUIT to restrain the defendants from building an electric railway over a specified route, claimed to be unauthorized, brought to the Superior Court in Hartford County and tried to the court, *George W. Wheeler, J.,* upon the defendants' demurrer to the complaint; at the request of the parties the court sustained, *pro forma*, the demurrer, and dismissed the complaint, and the plaintiff appealed for alleged errors in the rulings of the court.   *Error.*

The case is sufficiently stated in the opinion.

*Edward D. Robbins,* for the appellant (plaintiff).

The railroad which the Newington Tramway Company is attempting to construct, is unauthorized, as it differs radically from that which it was chartered to build.   *Works* v. *R. R.,* 5 McLean, 425 ; *Rahn Township* v. *St. Ry.,* 167 Pa. St. 90 ; *People* v. *Albany, etc., R. R.,* 24 N. Y. 261 ; *Lee* v. *Milner,*

2 M. & W. 824; *State* v. *Hartford & N. H. R. R.*, 29 Conn. 538; *Cohn* v. *Wilkinson*, 12 Beav. 125; *Blakemore* v. *Glamorganshire Canal Navigation*, 1 Myl. & K. 162; *The Queen* v. *Eastern Counties Railway*, 10 Ad. & E. 531, 546; *Agar* v. *Regent's Canal Co.*, 1 Swanst. 250; *Rex* v. *Cumberworth*, 4 Ad. & E. 731; *Rex* v. *Edge Lane*, ibid. 723; *Rex* v. *Cumberworth*, 3 B. & Ad. 108; *Attorney-General* v. *West Wisconsin Ry*, 36 Wis. 466; *Penn. R. R.* v. *Montgomery Co. Pass. Ry.*, 167 Pa. St. 62, 73. In Connecticut the abutting landowner owns the fee of the land upon which a highway is located, subject only to a definite easement. The easement of highway differs from a simple easement of way, in that it is vested in the general public, instead of being appurtenant to other land, or belonging to definite individuals. Any act done by a member of the general public with relation to the land, unless it is an exercise of the right which constitutes the easement, is to be regarded precisely as it would be if no such easement existed. *Read* v. *Leeds*, 19 Conn. 182; *Peck* v. *Smith*, 1 id. 103; *Woodruff* v. *Neal*, 28 id. 165; *Benham* v. *Potter*, 52 id. 248. Placing permanent structures on a man's land and operating a railroad over it amounts to something more than the exercise of the right belonging to all the members of the general public, which constitutes the easement of highway. This has been decided for Connecticut in *Imlay* v. *Union Branch Railroad Company*, 26 Conn. 249. The case of *Elliott* v. *Fair Haven and Westville Ry.*, 32 Conn. 579, is not in point. The railway about to be constructed by the defendants is not the sort of a thing which *Judge Ellsworth* described as "a jogging horse with a species of omnibus attached, stopping every few rods to take in and let out passengers." In this State it is law that the right of travel belonging to the members of the general public, which constitutes the easement of highway, does not include the right to build and operate a railroad. There are not wanting decisions to the same effect in other states: *Williams* v. *N. Y. Cent. R. Co.*, 16 N. Y. 97; *Craig* v. *Rochester City, etc., R. Co.*, 39 Barb. 494, 39 N. Y. 404; *Eldridge* v. *Rochester, etc., R. Co.*, 61 N. Y. Supreme Court, 194; *Penn. R. R.* v. *Montgomery*

*Co. Pass. Ry.*, 167 Pa. St. 62; *Penn. R. R.* v. *Street Ry.*, 176 id. 559, 576; *Broome* v. *N. Y. & N. J. Telephone Co.*, 42 N. J. Eq. 141; *Indianapolis, etc., R. R.* v. *Hartley*, 67 Ill. 444; *Mahon* v. *N. Y. Cent. R. R.*, 24 N. Y. 658; *Schurmeier* v. *St. Paul, etc. R. R.*, 10 Minn. 82; *Gray* v. *First Division of the St. Paul, etc., R. R.*, 13 id. 315; *Southern Pacific R. R.* v. *Reed*, 41 Cal. 256; *Starr* v. *Camden, etc. R. R.*, 4 Zabr. 592; *Cox* v. *Louisville, etc., R. R.*, 48 Ind. 178; *Ford* v. *Chicago & N. W. R. R.*, 14 Wis. 609; *Grand Rapids & Ind. R. R.* v. *Heisel*, 47 Mich. 393; *Reichert* v. *Railway*, 51 Ark. 491; *Kucheman* v. *C. C., etc., R. Co.*, 46 Iowa, 366; *Hastings, etc., R. Co.* v. *Ingalls*, 15 Neb. 123; *Springfield* v. *Conn. River R. R.*, 4 Cush. 71; *Chamberlin* v. *Elizabethport Cordage Co.*, 41 N. J. Eq. 43; *Carl* v. *Sheboygan, etc., R. R.*, 46 Wis. 625, 628; *Lawrence R. R.* v. *Williams*, 35 Ohio St. 168. Where a threatened trespass is one which in its nature will be recurrent, or continuing, it has been repeatedly held that an injunction may properly be granted. *Ardley* v. *Guardians, etc.*, 39 L. J. Ch. 871, 873; *Goodson* v. *Richardson*, 43 L. J. (N. S. Eq.) 790; *New York, etc., R. R.* v. *Comstock*, 60 Conn. 200, 214. The cases cited by defendants' counsel show that, in some States, courts have been induced to hold that the location of a railroad in a street may be merely an exercise of the easement of highway. The principles of law invoked by such courts to sustain this conclusion, will, on a critical examination, be invariably found to be in logical conflict with the well-settled law of this State, and not in harmony with each other.

*Charles E. Perkins* and *Frank L. Hungerford*, for the appellees (defendants).

It has been repeatedly held that the construction of a street railway imposes no additional servitude upon abutting land. Booth's Street Railway Law, § 83; *Williams* v. *Street Railway*, 41 Fed. Rep. 556; *Halsey* v. *Street Railway*, 47 N. J. Ch. 380; *Taggart* v. *Street Railway*, 16 R. I. 668; *Lockhart* v. *Craig St. Ry.*, 139 Pa. St. 419; *Elliott* v. *Fair Haven, etc., R. R.*, 32 Conn. 579. This case was decided after *Imlay* v.

*Union Branch Railway Co.*, 22 Conn, 249, and is clearly distinguished from it by the learned judge on page 586. See also *Atty.-Gen.* v. *Metropolitan Railroad Co.*, 125 Mass. 515, 517; *Pierce* v. *Drew*, 136 Mass. 75; *Chase* v. *Sutton Mfg. Co.*, 4 Cush. 153; *Cater* v. *Telephone Co.*, 60 Minn. 539; *Potter* v. *Saginaw Union St. Ry.*, 83 Mich. 285; *Detroit St. Ry.* v. *Mills*, 85 id. 634; *People* v. *Fort Wayne & E. Ry.*, 92 id. 522; *Dean* v. *Railway Co.*, 93 id. 330; *Nieman* v. *Detroit Suburban St. Ry.*, 61 N. W. Rep. 519; *Reeves* v. *Philadelphia Traction Co.*, 152 Pa. St. 153; *Koch* v. *North Ave. R. R.*, 75 Md. 222; *Green* v. *City & Suburban Ry.*, 78 id. 294; *Powell* v. *Macon, etc. Ry.*, 92 Ga. 209; *Louisville Bagging Co.* v. *Central Passenger Ry.*, 95 Ky. 50; *Halsey* v. *Rapid Transit St. Ry.*, 47 N. J. Eq. 380; *Patterson Ry.* v. *Grundy*, 51 id. 213; *State* v. *Board of Public Works of Trenton*, 29 Atl. Rep. 149; *Kennelly* v. *Jersey City*, 30 id. 530; *West Jersey R. R.* v. *Camden, etc., R. R.*, 52 N. J. Eq. 31; *Telegraph and Telephone Co.* v. *Electric Ry. Co.*, 93 Tenn. 492; *Williams* v. *Citizens Railroad*, 130 Ind. 71; *Mt. Adams, etc., R. R.* v. *Winslow*, 3 Ohio Circuit Court, 425. The whole gravamen of the complaint is that the proposed railway is deviating from its chartered route, and not that it is imposing without compensation an additional servitude upon the plaintiff's land. The remedy sought is to compel the construction of the railway so as to conform to the chartered route, and there is no allegation that such construction would make the burden upon the plaintiff's land any less than would be imposed if the proposed route is followed. If the defendants, or any one of them, are violating their chartered rights in the manner complained of, only the State or a stockholder can interfere. No legal or equitable right of the plaintiff is invaded, and consequently no injury in a legal sense is done it which can support this action. *Dock Co.* v. *Railroad Co.*, 32 N. J. Eq. 755; *Railway Co.* v. *Ellerman*, 105 U. S. 166.

BALDWIN, J.   It is the prevailing doctrine in the United States, and was settled, as respects this State, in the case of *Imlay* v. *Union Branch Railroad Co.*, 26 Conn. 249, that the

location of an ordinary steam railroad upon a highway imposes an additional burden upon the soil, for which the owner of the fee is entitled to demand compensation.

The *Imlay* case was put upon the ground that no substantial, practical, or even technical identity exists between the use of land for a highway and for a steam railroad. One of the differences pointed out by the court was that the railroad usually was and always might be so made as to be inconvenient and even impassable to ordinary travelers, the construction of its embankments and bridges being unadapted to the use of such vehicles as ply over a common road. Another was, that every individual had an equal right of passage over a highway, and therefore that all must use this right so as not to prevent or obstruct its exercise by others ; while a railway could only be built and operated by virtue of the possession of a special privilege, independent of and derogating from the general privileges belonging to the public, and which created a perpetual right against the proprietor of the fee in favor of a person—the proprietor of the railroad—to whom before he bore no legal relations whatever. It was pointed out that the discontinuance of a highway traversed by such a railroad would still leave the land subjected to the burden of supporting and serving the latter ; since its location upon the highway was made under an express and independent grant by the State of a new and distinct easement.

The essence of the decision was that the grant of a railway franchise by the legislature, authorizing the occupation of land subject to a highway in such a manner as substantially to interfere with the proper uses of a highway, or substantially to change them by introducing another not practically identical with the original ones, was the bestowal of a power, the exercise of which charged the land with a new servitude.

In determining what are the uses of a highway under the common law of Connecticut, and whether its occupation by an electric street railway can be one of them, the preamble of our earliest statute upon that subject speaks with some

authority.    It declares that " the mainteineing of high wayes
in a fitt posture for passage according to the severall occas-
sions that occurre, is not onely necessary for the comfort and
safety of man and beast, but tends to the proffitt and advant-
age of any people, in the issue."    Code of 1650, Title, Highe
Wayes; 1 Col. Rec. 527.    This court has said that in these
words is found a statement of the principles which should
govern and ever have governed the legislation of this State
as to the maintenance of highways, and that, as they have
regard not only to providing for the comfort of man and beast
but for the profit and advantage of the people, they must be
held to have originally " contemplated all such improvements
in structure and grade, as 'occasions' occurring in conse-
quence of the advancement and growth of the country, and
particularly of populous and growing cities, should make
necessary."    *New Haven* v. *Sargent*, 38 Conn. 50, 54; *Shelton
Company* v. *Birmingham*, 61 id. 518, 525.    The common law
of Connecticut is thus somewhat more favorable to the rights
of the public as against the owner of the soil, than the com-
mon law of·England.    There no one, except the owner of
the fee, can use a highway for any other purpose than that
of passage, or what may be subservient to that, unless he
can claim under some special franchise.    *Regina* v. *Pratt*,
4 El. & Bl. 860, 865; *Goodson* v. *Richardson*, L. R. 9 Ch.
App. Cas. 221.    Here an individual can go or linger upon
one, solely from motives of curiosity.    *Bunnell* v. *Berlin Iron
Bridge Co.*, 66 Conn. 24, 36.

Whoever holds property subject to a public trust holds it
subject to the same extent, to public control.    The owner of
the fee in a highway holds his estate subject to a public
right, which is equally, and for similar reasons, subject to
public control so far as may be necessary to protect the pub-
lic in the full enjoyment of whatever belongs to them.    This
power of control resides primarily in the General Assembly.
It is their judgment that street railroads furnish a proper
means of accommodating public travel on highways; and
the judicial department of the government will not pro-
nounce charters granted for their construction to be invalid

because they make no provision for additional compensation to the owners of the soil, unless forced to the conclusion that to give them effect would necessarily sanction an invasion of private right. In *Goodson* v. *Richardson*, L. R. 9 Ch. App. Cas. 221, 224, LORD CHANCELLOR SELBORNE remarked that "Parliament is, no doubt, at liberty to take a higher view upon a balance struck between private rights and public interests than this court can take." The same thing is true of our General Assembly. The reasonableness of its action in any matter within its appropriate jurisdiction is not a matter of judicial question, unless it be plainly apparent that some constitutional right or fundamental principle of society has been invaded. *Bissell* v. *Davison*, 65 Conn. 183, 192.

A street railway, such as that authorized by the charter of the defendants, differs from the ordinary railway running from one State or town to another, part of which may chance to be located on a highway, in certain essential characteristics. Its tracks conform to the established grade of the highway. It has no exclusive privilege as to their use. *Laufer* v. *Bridgeport Traction Co.*, 68 Conn. 475. Its mode of using the street does not necessarily or naturally render that part of it which it occupies, whether by its tracks or its poles and wires, impassable or seriously inconvenient for ordinary travel. Such a street railroad may be, and up to the present time such roads have usually been, so constructed and so used and operated as to be distinguished from the ordinary steam railroad in every one of the particulars stated in the *Imlay* case, though undoubtedly electric roads do approach steam roads more and more in construction and in the manner of operation.

But as yet there is a substantial identity in many particulars between the use of a highway by an electric car and that by an ordinary vehicle, both moving upon the same grade. The test whether the land in the street is, by the imposition of the tracks, subjected to a new use, must in some measure be a question of degree. So far as the change of power is concerned, the substitution of electricity for animal power to draw cars running upon surface tracks, is

no greater innovation on the ancient uses of a highway than the introduction of the bicycle, with its complicated arrangement of mechanical contrivances for multiplying motion and increasing speed, or the horseless carriage operated by the use of petroleum. Steam carriages, with broad tires, and sometimes running in heavily laden trains of two cars and a locomotive, have been used on the solid and level highways of England for many years, under appropriate regulations prescribed by Act of Parliament (41 & 42 Vict. Chap. 77), to secure the public safety. In some of the great cities of Europe tramways, built into the streets, have been in use for centuries as a means of facilitating ordinary teaming. They are constructed of long and narrow slabs of marble, laid in parallel lines, with cobble stones between, on which the horses find a secure footing, while the wagons they draw run easily over the smooth marble. *Biot's Manuel du Constructeur de Chemins de Fer*, p. 4. Such marble tracks do not differ in kind from steel tracks, and it is a matter of common knowledge that teamsters often drive upon the rails of street railroads, when the cars are not passing over them, for convenience in hauling heavy loads,—a use to which it would be impossible to put the differently shaped rails of the ordinary steam railroad. Street car tracks, therefore, in some degree, serve to promote the common right of passage over the highway; while the "standard" railroad track never can.

The electric railway, like every other, can be laid and operated only under a special franchise; but it is one which, though independent of, does not necessarily derogate from, the general privileges belonging to the public; for if the road be constructed and operated with due regard to the convenience of ordinary travelers, they can use every portion of the highway substantially as they did before. While a car is occupying or approaching any particular portion of the tracks, other travelers must indeed give way; but it is only because they can turn out, and the car cannot. Without any such absolute necessity, a loaded team must, under our laws, turn aside when overtaken on the road by a lighter

154 APRIL, 1897.

Canastota Knife Co. *v.* Newington Tramway Co. et al. Vol. 69

vehicle. This statute (General Statutes, § 2691) has been in force for a hundred years, and its validity has never been challenged. *Hotchkiss* v. *Hoy*, 41 Conn. 568.

In the *Imlay* case reliance was also placed on the right to continue the operation of a steam railroad built upon a highway, although the highway itself should be legally discontinued. Assuming that right to exist, no such doctrine can be asserted in respect to a street railway of any description. That is an incident of the street. Its main purpose is, presumably, and should be in fact, to facilitate and further the use of every street through which it passes. If it should run over a thinly settled country road between two cities, this would be no less true. Highways are for through travel as fully as for local travel. A street railway laid over them must always serve both purposes, to a greater or less extent. If it fails in either, it loses its identity with ordinary highway use. A steam railroad ordinarily serves but one, and thus has not such identity. It connects different towns or villages, and seldom has more than one station in each. A street railway without a street to run on, and to serve and accommodate as it runs, would be an anomaly. The charter of the Newington Tramway Company certainly does not assume to create anything of that description. Had it done so, the franchise granted would have been foreign to the uses for which highways have been established. When a street is discontinued, any railway tracks which may have been laid in it are no longer upon land burdened with the public easement of a highway, but rest upon private soil, as truly as if no highway had ever encumbered it.

New York is the only State in which the courts have accepted the position that a railroad, designed for the transportation of passengers, or passengers and property, and not operated by steam, imposes a new servitude on the soil of a city or village street; and this conclusion is there rested on the ground that the railway company has a right of an exclusive character to the use of its tracks, which is, to a certain extent, paramount to the general public right of travel. *Craig* v. *Rochester City & Brighton R. R. Co.*, 39 N. Y. 404.

APRIL, 1897. 155

Vol. 69    Canastota Knife Co. *v.* Newington Tramway Co. et al.

In this State, while we have held that the railway structure
is the private property of the company, and in the nature of
real estate, we have held also that its right to pass over it is
no greater than that of any other member of the community.
*New Haven* v. *Fair Haven & Westville R. R. Co.*, 38 Conn.
422, 430 ; *Laufer* v. *Bridgeport Traction Co.*, 68 id. 475.   The
legislature can regulate the use of this structure as fully as
they can regulate travel over any other part of the highway.
It has seen fit to prohibit, under penalty of fine and impris-
onment, the use, except in special cases, by order of the Su-
perior Court or one of its judges, of street railway tracks by
others than their owners, for vehicles with running gear
specially fitted to the rails, and carrying passengers for hire;
but otherwise their use is left free for all.   General Statutes,
§ 3604; Public Acts of 1893, p. 314.   Should the charter of
a street railway company be repealed, there is high author-
ity for the position that, in the absence of any vested rights
of contract in third parties, all private property in its tracks
and road-bed would be extinguished.   *Greenwood* v. *Freight
Co.*, 105 U. S. 13, 21.   It is, at most, a limited and qualified
property right.   The company owns not land, but a right to
the use of land, and a right inherent merely in the public
easement of the highway, limited to the life of such ease-
ment, and belonging only to the possessor of a subsisting
franchise from the State.   1 Redfield on Railways, 317, 319.

No grant of any power of eminent domain is to be found
in the charter of the Newington Tramway Company.   If,
therefore, the franchise to construct a street railway, which
it assumes to grant, cannot be exercised in case of objection
on the part of any of the abutting landowners, without the
aid of compulsory proceedings, it must fail of effect, and
fail because the charter is in conflict with the Constitution,
in that it purports to allow the taking of private property
for public use without just compensation.   *Howe* v. *West
End Street Railway Co.*, 167 Mass. 46, 44 Northeastern
Rep. 386, 387.   The underlying question thus presented is
one of statutory rather than of constitutional construction.
It is settled that whenever the property of the owner of the

fee in a highway is subjected by law to an additional servitude, it is taken, and he is entitled to just compensation. *Nicholson* v. *New York & New Haven R. R. Co.*, 22 Conn. 74, 85. The matter now to be determined is whether such property is subjected by this charter to an additional servitude; and that depends on the true limits of the public easement in a highway.

The best definition of a public easement is often that given by public use. A highway is a way over which the public at large have a free right of passage. It is constructed and maintained in their interest. This liberty of passage may always be exercised in such a manner as may, at the time, be customary and reasonable, having in view both the convenience of the public and the proprietary rights of the owners of the soil. As to what is reasonable under these limitations, every age, speaking by its common law, must of necessity judge by its own standard. A common use of the highways in Connecticut for a period longer than the life of a human generation has been that by street railways. So far as horse railroads are concerned, it was held to be a proper one by the Superior Court in a case decided in 1860, and published in our reports in 1866. *Elliott* v. *Fair Haven & Westville Railroad Co.*, 32 Conn. 579. While that authority is not one binding upon this court, and there are expressions in the opinion of *Judge Ellsworth* to which we should hesitate to give unqualified assent, no appeal was taken from his judgment, and the doctrine which it announced has so far met with public acquiescence, that no owner of the soil subject to a highway has since set up a claim to compensation for the construction of a street railway upon it, until the institution of the present suit. During the intervening period, numerous franchises for such railways have been granted and exercised. Many horse railroads have been thus built, and many electric railroads. Large sums have been invested in them by shareholders. Mortgages of the franchises and of the railroad property acquired under them have been authorized. Special Acts, Vol. VI, p. 611; General Statutes,

APRIL, 1897.     157

Vol. 69     Canastota Knife Co. *v.* Newington Tramway Co. et al.

§ 3606; Public Acts of 1893, p. 314. Mortgage bonds, thus secured, have been issued to the amount of millions.

This course of legislation, and all that has been done under it, with the support of general public acquiescence, constitute a practical exposition of the common law of Connecticut as to the character of the servitude in the case of a highway, which must outweigh any narrower definitions that may have been framed either by English or American courts, in former centuries, and in the presence of different social conditions; however often these may have been repeated in later decisions.

It has always been claimed as the distinguishing feature of the common law that, because it is unwritten and so untrammelled by set forms of words framed in the imperative terms of statutory command, it can keep more in touch with the times than any system of jurisprudence centering in a code. " *Quicquid agant homines,*" said LORD MANSFIELD, " is the business of courts, and as the usages of society alter, the law must adapt itself to the various situations of mankind." *Barwell* v. *Brooks,* 3 Dougl. 371, 373.

The common law definition of the public right in a highway did not embrace in terms, but it did in spirit, its use by public authority for laying water-pipes, drains, cisterns or hydrants, from which to draw in case of fire, and gas-pipes, and as a site for public sign-posts, and pumps; and to that extent it has long been enlarged by practical construction. *Cone* v. *Hartford,* 28 Conn. 363, 375; *Norwich Gas Light Co.* v. *Norwich City Gas Co.,* 25 Conn. 19, 38; *Norwalk Gaslight Co.* v. *Norwalk,* 63 Conn. 495, 497, 530 ; Cooley on Constitutional Limitations (6th ed.), 682. Grants of such privileges to private aqueduct companies for laying their pipes to supply private consumers, without making any payment to the owners of the soil, have been freely made by the General Assembly for a hundred years. In 1798 such permission was granted to the Windsor Aqueduct Company. 1 Private Laws, 63. In 1800 a similar grant was made to the Proprietors of the Aqueduct in New London; and in 1802 they were further authorized to lay their pipes on pri-

vate grounds; but in that case only on paying all damages to the landowner, as they might be ascertained either by agreement or condemnation proceedings. 1 Private Laws, 51, 52. A similar distinction was made in the charter of the Sharon Aqueduct Company, in 1802. 1 Private Laws, 60.

The owners of the fee in highways constitute a large part of the population of this State. They have known of this course of legislation, and of the gradual extension in other directions of the use of their ground, under authority of the State. As part of the public, they have shared in its benefits, in respect to the land of others. They have acquiesced in all that has been done, by not objecting to it, or not insisting on any adverse claims by judicial proceedings. The common law of Connecticut has been shaped by common usage in Connecticut. We have left it to our common law to define the rights acquired by the public upon the establishment of a highway; and as common law is but another name for customary law, custom must determine, in case of doubt, how highway travel can best be facilitated.

It is certain that every reasonable presumption should be made in favor of the validity of grants by the legislature of the right to construct railroads upon highways. They can be so built or operated as to be a substantial interference with public travel, or to work a new, direct, and special damage to the proprietor of the soil. They can, on the other hand, be so built and operated as to serve the public, without injury to the landowner. Charters which, like those of the ordinary steam or "standard" railroad, contemplate and require a mode of construction or operation of the former description, impose a new servitude on the soil. Charters which go no farther than to authorize such a mode of construction or operation, as one means of accomplishing their purposes, impose no new servitude, and invade no private rights, unless resort is in fact had to such means; in which event they do, and compensation may be required.

Two rights are to be guarded with equal care,—that of the individual landowner, and that of the public at large; but his estate is the servient tenement. He has no rights which

are incompatible with the fullest enjoyment of the public easement.

A street railway may be so constructed and operated as to be a proper means of facilitating public travel. It may also be so constructed, but not so operated. It is, in such case, a means that may be and is abused; but for any abuse the law can supply the remedy. Nor would the legislative grant, in such a case, avail to deprive the owner of the soil of his right to compensation.

If it is unsafe to run more than a single car at a time, then only one car at a time can be run. If it is unsafe to run at a high rate of speed, then a lower rate of speed must be maintained. If a railway be so worked in any manner as to create a public nuisance, the State's Attorney can readily find means to compel its operation with proper regard to the public interests.

If either the mode of construction or of operation be such as to make it a substantial impediment to public travel or a proximate cause of special damage, of a new description, to the owner of the soil, the law will give redress. Such acts can have no warrant from the existing servitude or the legislative franchise. If an electric railway is operated by the use of overhead wires, and these are found to be a cause of danger, they can be replaced by some better contrivance. *Central Railway & Electric Company's Appeal*, 67 Conn. 197, 211. If the highway is obstructed by cuts or embankments, they can be made the subject of civil or criminal proceedings. If special and peculiar damage is done or threatened to any particular landowner, whether the proprietor of the fee in the highway or of adjoining land, his rights of action are clear and certain.

The plaintiff's complaint sets up that it owns the fee in certain land within the limits of a highway in Newington, upon which the defendants threaten and intend to construct a street railway. An injunction is claimed on two gronnds: first, that the charter of the Newington Tramway Company (Private Acts of 1893, p. 1035) imposes a new burden on the plaintiff's soil; and second, that it has wrongfully conspired

with the other defendants, the Central Railway and Electric Company and the Hartford Street Railway Company, to use its charter for laying a railway track upon the land in question, under a location which diverges substantially from any of the routes authorized, and is in fact another route designed to constitute merely part of a through railroad between New Britain and Hartford.

The charter in question is not one which, under the principles which have been stated, contemplates and requires the construction of a railway in such a manner as substantially to obstruct ordinary highway travel, or necessarily to cause special damage to any landowner; and it is not alleged that it is intended to construct it so that any of those effects would be produced. There was, therefore, no error in sustaining the demurrer, so far as this ground of relief was concerned.

But the construction of any kind of railway in a highway, the soil of which belongs in fee to the adjoining proprietors, is a trespass upon their land, unless it has been duly authorized by law. The use of a highway for ordinary travel is a matter of common right; but to lay down upon it a fixed structure, of a permanent character, designed for the use of vehicles of a peculiar description, moving upon invariable lines of track, cannot be justified without a special franchise, proceeding from the State. *Regina* v. *Train*, 2 Best & Smith, 640. That such vehicles may be open to all on equal terms, and so may serve to facilitate the common use of the highway by the general public, is not, of itself, enough. A stone pavement might convert a miry and neglected road into a convenient thoroughfare; but no one could enter and construct such an improvement on land owned in fee by another, without authority derived from appropriate legislation.

A franchise was granted to the Newington Tramway Company, for the construction of a street railway, to be operated by means of any power except steam, over certain routes particularly specified. A location upon the plaintiff's land can be within its terms only if made as part of a location

which substantially follows some one of the routes specially described. Each of those routes is an entirety. *State* v. *Hartford & New Haven R. R. Co.*, 29 Conn. 538. The through route, which the defendants propose to constitute between New Britain and Hartford, must also be viewed as an entirety, in determining the purpose of laying tracks upon the plaintiff's land, and the effect of that purpose. *New England Railroad Co.* v. *Central Railway and Electric Co.*, 69 Conn. 47 ; *Boston & Lowell Railroad Corporation* v. *Salem & Lowell R. R. Co.*, 2 Gray, 1, 31, 39 ; *Pennsylvania Railroad Co.* v. *Montgomery County Passenger Railway Co.*, 167 Pa. St. 62, 73, 31 Atl. Rep. 468. A franchise to build a railroad from Hartford to Derby would be no warrant for building one between Hartford and Norwich, nor yet for building one in Hartford which it was intended to continue, not to Derby, but to Norwich. Nor would the State alone have the right to object. Any property holder in Hartford upon whose land such a location might be made, whether that land was or was not within the limits of a highway, could claim the protection of the courts. The fact that the contemplated railroad would be a means of accommodating public travel between Hartford and Norwich, or local travel in Hartford upon a highway over the land of such proprietor, would be immaterial. To construct it without legislative authority would be a trespass upon his estate, for which he could support an action at common law.

Such a remedy, however, would be not an adequate one. The injury in the case supposed, and the injury threatened in the case at bar, is a continuing one, and while the tracks would constitute a public nuisance, the plaintiff would suffer a special and peculiar damage. *Burlington* v. *Schwarzman*, 52 Conn. 181; *Trowbridge* v. *True*, ibid. 190, 199. The wrong alleged is an invasion of its freehold, under a plea of authority which fails, because unsupported by law. That an injunction is a proper remedy where the justification is under an unconstitutional statute, is undisputed. *Imlay* v. *Union Branch Railroad Co.*, 26 Conn. 249, 260. Such a statute is not law. It cannot, therefore, serve as a protection to those

who assume to act under its provisions. But a statute which is law, is no better protection to those who assume to act under its provisions, but in fact act outside of them. It follows that the demurrer should have been overruled, on the ground that the defendants had no franchise justifying, or purporting to justify, their threatened invasion of the plaintiff's freehold, for the purpose which they had conspired to accomplish.

There is error in the judgment appealed from.

In this opinion TORRANCE and FENN, Js., concurred.

HAMERSLEY, J., (concurring in the judgment). By the settled law of this State the plaintiff is the owner in possession of the land described, and an invasion of that possession by an act not authorized by the "ordinary easement of the public in the same as a highway," is a trespass as truly as if no highway existed. This law is settled by a line of uniform decisions extending from 1810 to the present time. *Stiles* v. *Curtis*, 4 Day, 328, 336; *Peck* v. *Smith*, 1 Conn. 103; *Watrous* v. *Southworth*, 5 id. 305; *Chatham* v. *Brainerd*, 11 id. 60; *Champlin* v. *Pendleton*, 13 id. 23; *Read* v. *Leeds*, 19 id. 182; *Nicholson* v. *N. Y. & N. H. R. R. Co.*, 22 id. 74; *Norwich Gas Light Co.* v. *Norwich City Gas Co.*, 25 id. 19; *Imlay* v. *Union Branch R. R.*, 26 id. 249; *Cone* v. *Hartford*, 28 id. 363; *Woodruff* v. *Neal*, ibid. 165; *Benham* v. *Potter*, 52 id. 248, 252; *Platt* v. *Milford*, 66 id. 320.

The defendants threaten to dig up the plaintiff's land and lay thereon a permanent structure for the operation of a railroad. This is a trespass and a continuing trespass, which may be restrained by injunction. Whether an injunction must issue in every such case, when the trespass consists in the occupation of land for a public use and compensation does not precede such occupation, is a question which we have heretofore treated as unsettled; *Gilpin* v. *Ansonia*, 68 Conn. 72, 79; *Hooker v. N. H. & N. Co.*, 15 id. 312, 326; and is one not necessary to consider now. The error here is in holding that an injuction could not issue. The question of discre-

tion was not raised.   The defendants claim that the threatened acts are not a trespass, because the land of the plaintiff is burdened with the rights secured to the public at the time the highway was laid out, and, as one of those rights, with the right to build a railroad.   When a highway is laid out, the property of the owner in the land so covered is burdened with a way; and the transaction between the owner and the State, then completed, determines finally—so far as property rights are concerned—the nature and extent of the way so acquired by the State, and the amount of the damage suffered by the owner through the grant of such a way.   So far as the transfer of property is concerned, the same principle applies that would apply to a similar transaction between individuals.   When a way is purchased by an individual its nature and extent is determined by the grant, and the price paid is full compensation for the incorporeal property or right defined in the grant, and for that only.   So when a way is purchased by the State, the incorporeal property or right acquired must be determined at the time of purchase; the price paid is compensation for the right then acquired, and for nothing more.   On the one hand the State may use the way so as to damage the owner to an amount vastly in excess of the original compensation, but if the use is within the terms of the grant the owner has no remedy.   On the other hand, for any purpose not included in the grant the owner's rights are absolute; to the surface of the way, to the soil beneath and to the space above; the State cannot appropriate it or any portion of it, except as it may take private property for public use.   From the very nature of such a transaction as laying out a highway, the limits of the property rights acquired, as well as the amount of compensation due for the surrender of such rights, must be then definitely and finally fixed.   "Necessary highways" (except in cities and boroughs) are laid out by the selectmen of towns, and, only in case of their refusal, by the Superior Court.   After the damage done to the owners of lands included within the layout has been legally ascertained and paid, and an officially attested survey describing each piece of land has been recorded in

164　　　　　　　　　APRIL, 1897.

Canastota Knife Co. v. Newington Tramway Co. et al.　　Vol. 69

the land records of the town, "such way shall be and remain for the use for which it was laid out." General Statutes, § 2699. The rights of the State in the way, and the property of the owner in the land subject to the way, are then fixed, and can only be changed by some new transaction. City streets "are public highways like any of the ordinary roads in the State;" *Norwich Gas Light Co. v. Norwich City Gas Co., supra;* and, with highways established through dedication, have substantially the same character as highways laid out by towns. The question at issue, therefore, depends upon the meaning of the term used by the statute—"the use for which necessary highways are laid out." The meaning is not doubtful; it has been clearly settled; since the decision of *Peck v. Smith, supra,* in 1814, it has never been questioned, but has been frequently affirmed by this court.

The first mention in our history of a highway is in 1635. Hartford, under the name of Newtown, was settled in October of that year. A town government was organized, and at a meeting of the freemen the following vote was passed: "It is ordered that for any time hereafter until it be restrained, the town shall have liberty to lay out any highway through any man's ground, if it be found needful, provided they give the party reasonable satisfaction." This vote appears on the Hartford town records under date of "1635." It must therefore have been passed between October, 1635, and March 25th, 1636, and prior to the organization of the Magistrates' Court under the "commission" to Ludlow and others. It is the first known record of the exercise of sovereignty by any government within our limits, and is the beginning of our law of highways. This power seems to have been exercised by the townsmen (selectmen), and was confirmed and limited by a town vote passed January 1st, 1638-9 (two weeks before the adoption of the "Fundamental Orders") which declares: "It is agreed that the townsmen for the time being shall have the power of the whole to order the common occasions of the town except in the cases following;" the fourth exception being that they shall not alter highways already laid out. In April 1637, after the expiration of the Ludlow commission, a

common government was agreed upon by the three river towns in terms of which no record is known, but which were doubtless similar (except as to a "Governor") to those contained in the fundamental orders of January 14th, 1638–9. A General Court held in pursuance of such agreement between the towns, on April 15th, 1638, at the request of Hartford, ordered a "public highway for cart and horse" between Hartford and Windsor, and that on completion thereof the existing meadow road might be a foot-way. In June, 1640, it was ordered that the highway so laid out should be constructed and "made sufficiently passable, by each town what lyeth within their own bounds;" and in July following the purpose of the highway was stated "so as men may both ride and go on foot, and make drive of cattle, comfortably." 1 Col. Rec. 17, 51, 56. From 1638 to 1698 the General Court ordered six highways laid out, all, with possibly two exceptions, as public highways or "country roads" from town to town. (The word "country" was used as the ordinary name for what would now be called "State;" whatever related to the whole people as a State or Commonwealth related to the "country.") All other highways laid out during that period, except such as were dedicated, were laid out by the townsmen or selectmen in the several towns, by authority of the general powers possessed by towns. It was in 1698 that the General Court for the first time gave any special direction to towns in respect to laying out highways. It then directed that the selectmen in each town should take care that convenient highways "for the advantage of posts and other travelers in their journeying" through the colony "be laid out through their several townships;" and the next year the General Court passed an Act regulating the layout of highways; directing the County Court to lay out new highways "from town to town," and the selectmen to lay out "particular and private ways" for such town only; ("particular way" meaning a public highway not laid out from town to town). 4 Col. Rec. 247, 314, 315. In 1773 the highway Act was amended; the statute said that when upon application to the County Court a highway is laid out, approved and

recorded, " said highway shall be and remain a public high-
way ; " that the selectmen may lay out " public highways or
private ways," and in such case damage done to owners of
land " shall be paid by the persons applying for such ways, .
if the same be for their private use only; but if such ways
shall be for the common use of the inhabitants, it shall be
paid by the town ; " and that when a survey of such way
shall be made, accepted and recorded, and satisfaction made
to the persons damnified, that " such ways shall be and remain
for the use for which they are laid out," *i. e.*, private ways, for
private use only of parties applying for the same, " public
highways " for " the common use of the inhabitants."    14 Col.
Rec. 80.    This statute law as settled in 1773, with some
changes in procedure not necessary to note, is in force to day ;
the language of the original laws being largely preserved.

The course of legislation in reference to maintaining or
mending and repairing highways, is a little different.    At
first towns maintained highways as they laid them out, solely
in pursuance of their general power as towns, and through
their townsmen.    But in 1643 the General Court directed
towns to put the mending in the hands of two surveyors to
be chosen annually, who should have power " to call out
every team and person fit for labor " to mend the highways,
having " a special regard to those Comon wayes which are
betwixt town and town."    1 Col. Rec. 91.    This drastic
remedy for neglect in mending roads seems to have caused
some murmuring ; for in preparing the code of 1650, Mr. Lud-
low justifies the severity of the order by reminding the towns
that " the maintaining of highways in a fit posture for pas-
sage according to the several occasions that occur," is not
only necessary to the safety and comfort of man and beast
who have occasion to make the passage, but in the issue or
final result tends to the advantage of the people who have
the burden of maintaining them in a posture fit for such
passage.    1 Col. Rec. 527.    This duty of maintenance was
further enforced in 1672 by an Act imposing upon towns, as
a municipal duty, both the making and keeping in repair all
the needful highways (that may have been laid out), and

APRIL, 1897. 167

Vol. 69    Canastota Knife Co. *v.* Newington Tramway Co. et al.

creating a municipal liability for injuries to persons passing over such highway, by means of any defect in the same. This legislation of 1643 and 1672 has remained substantially unchanged, except that in 1795 all towns were authorized to lay a tax for mending highways, and the practice of the inhabitants themselves mending the ways, either under compulsion or to work out their tax, has become obsolete. In 1731 the town officers (highway surveyors) were authorized, in performing their duty of keeping highways in repair, to turn the water into any person's land "so far as may sufficiently drain such highway." 7 Col. Rec. 322. A general definition of highways laid out in pursuance of this legislation was given in 1679: "This court orders that the present roads from plantation to plantation shall be reputed the country roads or King's highway." 3 Col. Rec. 30. The subsequent highways laid out in pursuance of the legislation of 1698–99 and of 1773, were within that general definition. A review of this legislation settled in 1773, and since remaining substantially unchanged (unless in the case of streets established under special provisions in some recent city charters), establishes a clear and definite meaning to the language of our statute, first used in 1773, and to its legal effect, when it says that upon the establishment of a highway "such way shall be and remain for the use for which it was laid out." 1. It is a "way," *i. e.*, a right to pass and repass over the land of another. 2. It is a "country road or King's highway" by force of the general definition, *i. e.*, a way over which all persons have a full right of way—walking, riding or driving; and also, as well by force of the specific definition, a way for the common use of the inhabitants, *i. e.*, a way which gives no rights to any use which is not "common." 3. The establishment of the way with a right in all and every member of the public for its common use as a way, is coupled with a duty assumed by the State, and by immemorial practice imposed upon the several towns, of constructing and maintaining the way in a fit posture for passage "according to the several occasions that occur," and this duty carries a correlative power neces-

sary for the execution of the duty; it is a part of the con-
tractual transaction between the State and owner of the
land, so that the State cannot permanently renounce or cast
off the duty without a surrender of the way; nor in certain
cases without a liability to the owner for such a breach of
the original contract. 4. This limitation of the use, as a
way for such passage as is common to all, with the duty and
power to do the acts necessary to maintain the way in a con-
dition suitable for such passage as the occasions for such
passage may occur, determines the compensation to be paid
the owner of the land at the time this contractual transaction
between him and the State is completed; this compensation
is not the purchase price of the land within the limits of the
highway, but is the net damage to his whole piece of land,
including the portion of it within the highway, by burden-
ing that land with a way for the use defined by statute;
and so the damage and the benefits to this particular land
by this kind of way are set one against the other, and if the
benefit exceeds the damage the owner is paid nothing, but
if the damage exceeds the benefits he is paid the balance; in
neither case is he paid anything for the land. This method
of ascertaining compensation springs *ex necessitate* from the
taking of a *mere way* for the public use; and so was practiced
from the first enactment of the statute in the last century.
See statement of INGERSOLL, J., in *Peck* v. *Smith*, 1 Conn.
103, 112. 5. The owner retains the absolute ownership of
the land, including every right of use and possession belong-
ing to such ownership consistent with the use of the way as
defined.

This definition of a highway and the legal effect of its
establishment, apparent from a study of our highway history
and legislation, has been affirmed and re-affirmed by this court
from the time the question was first raised, to this day. Many
highways were laid out by the original proprietors of town-
ships by way of dedication, and towards the end of the last
and beginning of this century, the ownership of the land
covered by such highways became a matter of warm contro-
versy, and gave rise to the conflicting opinions that are always

bred by conflicting interests.    This question arose in 1810 in *Stiles* v. *Curtis*, 4 Day, 328, but was only partially settled. Four years later it was again involved in *Peck* v. *Smith*, 1 Conn. 103, and, together with the meaning and legal effect of a highway, was finally settled.    The latter case affected an interest of slight value to the immediate parties, but as determining the rule which must control the title to a large part of the land within the State, it was of the most serious consequence.    The case was held under consideration for one year.    Of the nine judges, one expressed no opinion upon the vital points ; of the remaining eight, five substantially agreed with the result as stated in the opinion of JUDGE SWIFT.    This result settled the law that all highways, however dedicated to the public, followed the rule of highways laid out under the statute; and settled the relative rights of the State and the owner of the land in respect to highways laid out under the statute, in accord with the law we have stated as neces- sarily following from the provisions of the statute.    The court describes. rights acquired by the State in the estab- lishment of a highway, as follows: " A highway is nothing but an easement, comprehending merely the right of all the individuals in the community to pass and repass, with the incidental right in the public to do all the acts necessary to keep it in repair," p. 132; and holds, that while the public has only " a right of passage in a highway, the adjoining proprietors have the freehold, and own the soil; have a right to every use and profit which can be derived from it consistent with the easement; may take trees growing there- on, occupy mines, or sink water courses under it, and by the common law may depasture it; that when disseised, they can maintain ejectment, and recover the possession subject to the easement ; and can maintain trespass for any act done to the land not necessary for the enjoyment of the easement, which would be an actionable injury if the land was not covered by a highway; that the soil of a highway descends to heirs and passes to grantees as an appurtenant to the adjoining land; and whenever the highway is discontinued, the adjoining proprietors hold the land discharged of the easement."

p. 146. This definition of the incorporeal property or right acquired by the State, and of the absolute title for all other purposes remaining in the owner of the land, has been affirmed in the cases before cited, and emphatically in *Read* v. *Leeds,* 19 Conn. 182, 187 ; *Nicholson* v. *N. Y. & N. H. R. R.,* 22 id. 74, 89 ; *Norwich Gas Light Co.* v. *Norwich City Gas Co.,* 25 id. 19, 31 ; *Woodruff* v. *Neal,* 28 id. 165, 167 ; *Benham* v. *Potter,* 52 id. 248, 252 ; *Platt* v. *Milford,* 66 id. 320, 330. The rights of the owner to his land, subject to the public right as thus defined, are vested rights, and cannot, without compensation, be narrowed by this court by force of any " expansive " views of public convenience or necessity, any more than they can be taken by authority of the legislature for a public use related to and convenient for the use of highways, but not within the settled definition of the way acquired and paid for under the statute. We have held that the legislature cannot constitutionally authorize the right of an owner of land covered by a highway, to be so taken or qualified, in *Woodruff* v. *Neal, supra,* and in *Suffield* v. *Hathaway,* 44 Conn. 521. This court has never sanctioned in the least degree the theory that the owner's absolute right of possession can be invaded by any act not clearly within the definition of the way as fixed by the statute and affirmed by our repeated decisions, without subjecting the doer of that act to liability for the damage done—not even when authorized by the legislature. We cannot so hold without a violation of our duty under the Constitution. Whenever the question of the validity of exercising any right claimed not to be within the original definition of the way, has arisen, we have uniformly tested the claim by the definition above laid down. When the power to remove from one street to another, in a network of streets, so much of the soil as was reasonably necessary for the purpose of making and grading the street, was questioned, the power was affirmed upon the ground, and solely upon the ground, that such use, for the purpose of maintenance and repair of the soil covered by the way, was clearly included in the statutory definition of the right acquired by

the State at the time of the original layout. *New Haven* v. *Sargent*, 38 Conn. 50. When the right to recover damages for injury inflicted by a change of grade was claimed, the claim was denied solely upon the ground that the change of grade was a performance of the duty to maintain the road in repair; that the power to perform that duty, being within the rights acquired by the original layout, became a governmental duty; and that no citizen was entitled of right to compensation for consequential injury, no matter how serious it might be, inflicted in the proper performance of such duty. *Fellowes* v. *New Haven*, 44 Conn. 240; *Healey* v. *New Haven*, 47 id. 305. And the same ground is clearly stated in *Cone* v. *Hartford*, 28 Conn. 363, 372, as supporting the right to construct sewers. These decisions but reaffirm the definition of the right acquired by the State through the layout of a highway, as settled by the ancient statute, by the case of *Peck* v. *Smith*, and clearly re-stated by the late CHIEF JUSTICE STORRS in *Woodruff* v. *Neal*, *supra;* and are in accord with the latter case in holding that the legislature cannot, without compensation, extend the rights so defined.

I have deemed it necessary to be thus particular in stating the statutory definition (which is substantially that of the ancient English common law) of the precise right acquired by the State in laying out a way over private land, because in discussing the law of highway it is absolutely essential to any accuracy of reasoning, to distinguish with precision the source of the particular principle which must control the question in issue. The law of highways is affected by the power of the State to take property for public use, by its power to regulate the conduct of its citizens assembled in any public place, by its power through various forms of protective legislation to protect and care for the lives and health of its citizens; and in the exercise of the latter power, in case of extreme necessity, to injure or destroy property in its nature or by its use threatening life or health, or in some cases when put to an illegal use.

These powers, however, are not unlimited, and the nature of their exercise may become the subject of judicial consid-

eration. The valid use of these powers must depend upon conditions that are changing, and it is the duty of the court in applying the broad principles which control the exercise of such powers, to have regard to the existing conditions and not to be fettered by rules which might have been justified under the conditions of a hundred years ago, but have no foundation in view of the conditions of to-day. But the law of highways is also affected by the particular use of its power to take property for public use, which the State may choose to make. To purchase land by agreement or compulsory process for the purpose of promoting all means of communication between men, is one thing; to acquire by agreement or compulsory process a right of way over private land for the common use of all citizens in passing and repassing, is another and a very different thing. In the former case the vendor loses all right of property in the land sold; the possibility of reversion on the land being appropriated to a use not public, or an entirely distinct public use, is a remote interest which may or may not exist according to the terms of the sale. But in the latter case the owner does not lose his property in the land; that remains, as before, absolutely his, except so far as the beneficial use is limited by the terms of the agreement or public act defining the right of way acquired by the State. The former is a transfer of land, upon the conclusion of which all relation between the vendor and the State growing out of the ownership of the land, ceases; the latter is the grant or settlement of a right of way over land which remains the property of the grantor, absolute, except as its use is limited by the grant, upon the conclusion of which there is established a contractual relation between the owner of the land and the State, fixed by the terms of the grant, which cannot be altered without consent of the owner. When the State owns land for a public use, the legislature may modify or enlarge that use; but when the State has acquired a right of way to be used in a defined manner, neither the legislature nor the courts have the power to enlarge that use as against the donor or vendor of such way. *Williams* v. *N. Y. Cent. R. R.*, 16 N. Y. 97, 107. We

are dealing now with property rights which were fixed when a right of way was established over the plaintiff's land.    The law defining the rights acquired by the State in such a way, is not materially different from that in force 160 years ago, when, apparently, the highway described in the record was laid out.    7 Col. Rec. 397.    Changes in conditions may demand the acquirement of additional rights, or a change in the law defining the use for which highways shall in the future be laid out, or a radical change in the whole system of highways; but no change in conditions can alter the vested rights of the plaintiff in the land in question, as fixed when this right of way was acquired and the compensation paid for the rights then acquired and defined.

This question of vested right is not related to the questions that may arise under the exercise in different forms of the so-called police powers.    Remembering that, and that the occupation of the plaintiff's land in the highway by a railroad, so far as his right to be compensated for an injury thereby done is concerned, depends wholly upon the settled law of this State plainly defining the nature of the right of way acquired by the State when this highway was laid out, the decision of the question before us is freed from many difficulties, and the grounds may be briefly stated.

Authority by the State to construct a railroad in a highway, so far as it affects the property vested in the owner of the land, is not an exercise of its power to maintain the way in adequate repair, nor of its power to regulate the conduct of its citizens assembled in public places and their use of privileges common to all, nor of its power by protective legislation to care for the lives and health of its citizens.    No one of these powers justifies an invasion of the owner's property rights by such means.    Such an authority, if supported at all, must be supported simply under the claim that the contract existing between the owner of the land and the State, by which the owner has burdened his land with a right of way to be used in common by all the inhabitants in walking, riding or driving, in consideration of a price determined and paid for the damage involved by that specific use,

174 APRIL, 1897.

Canastota Knife Co. *v.* Newington Tramway Co. et al. Vol. 69

authorizes the occupation of the owner's land by a railroad structure, and its exclusive use by a single individual or corporation for the operation of a railroad. The claim is untenable. It requires only a bald true statement of the claim to demonstrate its unsoundness. Whether such a structure and its use is practically a nuisance or not, is immaterial; whether the mode of its construction and use is such as to make it a substantial bar, or a slight interference with the use of the way by all others, is immaterial; whether the damage caused to the owner of the land is nominal or ruinous, is immaterial. The only material question is whether such occupation and use of the land is within the incorporeal property or right purchased by the State and defined at the time of the purchase. If it is, the State may regulate and control such use to meet all possible conditions, no matter what damage the owner may suffer. If it is not, the occupation of the owner's land for that purpose is a trespass, no matter how insignificant the injury.

The right of passage is a right for passage in common by all citizens. It would not be claimed for a moment that any citizen in the exercise of this right, common to all, may construct and operate a railroad; when he steps upon that portion of the owner's land within the highway and strikes a pick for such purpose, he is guilty of a trespass as fully as if he did the same act upon that portion of the land without the highway. He can protect himself against that liability only by showing a franchise from the State. What is this franchise? It is the right to appropriate land not belonging to the individual, for the purpose of building on that land structures which, with the interest in the land to which they are attached, become his private property, and the right to the exclusive use of those structures for the transportation of passengers or freight, or both, " for the promotion of" his own direct and private advantage. *Bradley* v. *N. Y. & N. H. R. R.*, 21 Conn. 293, 305. Where such structures are laid in a highway by a railroad company the interest which it has is a right of way. " Its franchise consists in its right to lay and use exclusively a railroad subject to the duty of

running public cars thereon." Booth on St. Railways, p. 10. These structures and the right to their exclusive use constitute property. "The joint use of a portion of the track by two or more companies is something more than a mere incidental convenience; it is a partial appropriation of the property of one for the use of another for which just compensation must be made." Booth on St. Railways, p. 165. This is exercise of eminent domain. Dill. Mun. Corp. (4th ed.), § 727. This property is so far property in the soil that it may be taxed as real estate under a statute directing an assessment on all property specially benefited by a public improvement. *New Haven* v. *F. H. & W. R. R. Co.*, 38 Conn. 422, 430. It is plain that a way for passage, to be used by all citizens including the grantor of the way, in common, does not include a right of way for an exclusive use by one person or corporation; that a right to use the land for the purposes of such common passage does not include the right of vesting in one person or corporation an exclusive and private ownership in the land so distinct from the right of the public and all others that it may be taxed as real estate, and cannot be taken, even by authority of the legislature, by any other person for the same use without compensation. It seems idle to adduce argument in support of a proposition so clear. Such a franchise may be granted in two ways: one by discontinuing so much of the highway as is occupied by the railroad, and including in the franchise of the corporation an exclusive possession of the land; the other by continuing the highway for its original use, so far as the same is compatible with the distinct franchise vested in the corporation. But in either case the legal effect as to the rights of the owner of the land vested upon the layout of the highway, is the same. Much confusion in discussing this matter has arisen from the fact that in granting such a franchise the recipient is presented with two distinct properties—the property of the State and that of the landowner. By the terms of the original layout the State assumed, and acquired all power necessary to execute, the duty of constructing and maintaining highways in repair. In the exe-

cution of this duty large sums have been expended which have given great value to those highways, for the uses to which they are appropriated, and a great value for other and distinct uses to which by due process of law they may be appropriated.   This value constitutes a property.   By imposing this duty upon the several towns the State has, for all practical purposes, made the towns the legal guardians of this property.   So when a franchise is given to a company to use a highway and appropriate the land for the construction and operation of a railroad, that franchise includes the gift of a property of great value, accumulated by spending the taxation of years in constructing and grading the way, of which the town is the legal guardian; and also the gift of a different property belonging to the owner of the land. These two properties are entirely distinct.   "The interest of the city, as such, begins where the interest of adjoining landowners ends, and ends where such private interest begins."   *New Haven* v. *N. H. & D. R. R. Co.*, 62 Conn. 252, 256.   So far as the property represented by the town is concerned, the franchise is a "grant to a private corporation to take for its own profit . . . something from the absolute right of the public to the use of the highways."   *Borough of Stamford* v. *S. H. R. Co.*, 56 Conn., 381, 394.   We are not concerned now with the right of the legislature to vest such property in private corporations without requiring compensation, or with the policy of exercising such right.   I only wish to clearly mark the distinction between that element of the franchise which authorizes the taking of property represented by the town as legal guardian of the highway, and the element which authorizes the taking from the owner of the land a new right of way different from and not included in the right of way acquired and paid for by the State when the highway was laid out.   Considerations of importance in dealing with the property of the State in highways, now represented by the towns, have no application in dealing with the property in land over which the highway may pass.

It is claimed that a railroad is a means adapted to the "transportation of persons and property," which is the pur-

pose for which the highway was laid out. The latter part
of this proposition is not true. Highways might be laid out
for such purpose in the broadest terms, as they might be laid
out for any purpose which serves the convenience of man.
But our highways were laid out for a specific use, and the
contract between the landowner and the State is limited by
that specific use. So far as the property of the State in the
highway is concerned, it may be admitted for the present
purposes that it can be appropriated to any public use de-
manded by changing circumstances, but so far as the prop-
erty of the landowner is concerned it has never been parted
with except for the purposes of the specific use. The way
defined by our statute is for such modes of travel as may be
carried on by all citizens in common. So far as persons and
property may be transported by any citizen in exercising his
common right of travel, it is a legitimate use of the way in-
tended when the way was defined. But transportation of
persons and property by railroads is not carried on by a citi-
zen in his exercise of the common right of travel. It is of
necessity the exercise of an exclusive right in the nature of
a monopoly; it is antagonistic to the fundamental purpose
of a highway—the common use. So a canal is a means
adapted to the transportation of persons and property,—in
this respect there is no distinction in principle between a
railroad and a canal; there is a distinction in degree, in that
a canal, as to that portion of a highway in actual occupation,
must be more exclusive than a railroad must be, but hardly
more exclusive than a railroad may be. A railroad as well
as a canal may exclude from the highway all common travel.
How can a right of way which necessarily to some degree
limits, and potentially for practical purposes prohibits, the
use of the way for ordinary travel, be identical with a right
whose essential feature is a right common to all citizens to
travel by walking, riding or driving, as they may have occa-
sion? The two ways are distinct. They may be analogous
in some respects; in some respects they are antagonistic. It
has been held that the way ordinarily acquired by a turnpike
company is in origin and object identical with the common

highway; because the way acquired from the landowner is
for a common right of travel belonging to the public and not
to the turnpike company; it is "a public highway which all
the people have a right to use, and which no one has a right
to obstruct, not even the corporation that built it"; and so
when a turnpike company ceases to exist the way remains as
before a public highway for the common use of all; but when
a railroad or canal company ceases to exist the public has no
right to use the way for common travel.   The right of way
acquired for a turnpike as well as for a highway is for the
common use of the public in passing and repassing, and ex-
cludes any monopoly of that use in a single person (it is
immaterial to the public right created whether the cost of
construction and maintenance is paid by the public directly
by taxation, or indirectly by tolls collected from all who use
the way); the right of way acquired for a railroad is for the
single use of the corporation in passing and repassing, and
excludes any participation in that use by any portion of the
public.   From this fundamental cause arises "the obvious
and essential difference" between the two rights of way.
*State* v. *Maine*, 27 Conn. 641, 649.   The difference might
be illustrated in many ways, but it is unnecessary.   The
right of way acquired by the State from the plaintiff is de-
fined by the statute, and as defined does not include the
building of a permanent structure upon the plaintiff's land
for the exclusive use of one person in the transportation of
persons and property; such use of the plaintiff's land, whether
it lies within or without the highway, is a trespass for which
he is entitled to damages.   The amount of damage, the pub-
lic use, the policy of combining two distinct ways within the
same territorial limits, are wholly immaterial.   The plaintiff's
possession of his land is invaded by an act not authorized by
the right of way acquired by the State; for this act he is
entitled to damage;.if his property right is not protected by
some special process of condemnation, he is entitled to pro-
tection from the court.

I have thus far treated the case as if the question involved
were an open one; this seemed due to the claims pressed

upon us by counsel in argument.    But it is not an open question ; it was settled in the case of *Imlay* v. *Union Branch R. R. Co.*, 26 Conn. 249, substantially upon the same grounds I have endeavored to re-state more in detail.    It is true the defendant railroad in that case operated its cars by steam, but that fact had no relation to the ground of the decision ; it is not stated in the opinion whether the cars were to be moved by steam or horse power.    Nor was any weight given to the extent of the injury that might be caused ; on the contrary it is expressly stated that the legal distinction between a highway and a railway cannot be altered " because a railway may be so constructed as not to interfere with the ordinary uses of a highway, and so as to be consistent with the highway right already existing."    The opinion was written by the late CHIEF JUSTICE STORRS, and discloses that vigorous intellectual grasp and power of separating the substance of a question from its accidents, which distinguished this great judge ; it places the decision upon the solid foundation of a broad principle ; *i. e.*, the definition of the way sequestered by the State in the layout of a highway being contained in the statute authorizing a condemnation for that purpose ; this specific use measures the compensation paid to the owner, and must therefore limit the right acquired by the State ; any extension of that specific use is an encroachment on the estate remaining in the owner of the soil, for which he is entitled to damages.    In application of this principle the opinion holds that there is no such identity between the statutory highway and a railway, that the latter is included in the former.    The distinctions between highway and railway powers are essential and founded in the very nature of the powers themselves ; the highway burdens the locality with the right of every individual in the community to pass over the way at all times in the exercise of the ordinary modes of travel thereon, while the railway burdens the land with a peculiar use for one person exclusive of any rights in all others to that use ; and when a railway is authorized over a public highway, a new right is created against the owner of the fee in favor of a person to whom he before had

no legal relation whatever; and for this reason—this essential distinction in the very nature of the two rights of way—a railway is not included in the specific use defined in laying out a highway.

Three years later a petition was brought to the Superior Court for New Haven county (*Elliott* v. *Fair Haven and Westville R. R. Co.*) asking an injunction against laying a horse railroad track in the highway, and dismissed. Five years after the hearing, the opinion read by *Judge Ellsworth* who heard the petition in the Superior Court, and who was also a judge of this court, and opinions in two or three other *nisi prius* cases, were collated by the reporter and printed by him as a "Supplement" in the 32d volume of Connecticut Reports. This opinion holds that land in the highway may be occupied by a horse railroad, because of certain distinctions between a horse railroad and a steam railroad. The learned judge attempts to show that his ruling was in accord with the opinion of CHIEF JUSTICE STORRS in which he had concurred three years before; and evidently has no comprehension of the fact that he is attempting to overrule a decision of the Supreme Court of Errors by a decision of the Superior Court. Owing to the reporter's "Supplement" appearing in a volume of our reports, the case has very naturally been treated outside the State as a decision by this court, and has been cited in reports of other States as an opinion of this court overruling its decision in *Imlay* v. *Union Branch R. R. Co.* The Superior Court case has never been sanctioned in any way by this court; *Imlay* v. *Union Branch Railway Co.* has never been questioned, but has always been treated as settling the law of this State; and in a recent case we re-stated the broad ground on which that case was decided: " To us it seems obvious that there is little analogy between the case of a highway and a railroad, but in most respects there is contrast rather than analogy; for in the case of a highway the use is general and open to all, including the adjoining landowner as part of the public, but the public have no exclusive right to occupy any particular part

or put any permanent structure upon the way." *N. Y. &
N. E. R. R. Co.* v. *Comstock*, 60 Conn. 200, 209.

The defendants' railroad, as described by the allegations
of the complaint, admitted by the demurrer, comes within
the authority of the *Imlay* case.   The alleged trespass is to
be committed under a franchise which, as claimed, author-
izes the taking of a right of way without compensation, for a
railroad which shall "constitute merely a part of a through
railroad from New Britain to Hartford." This is a right of
way different and distinct from that taken for the common
use of the public when the highway in question was laid out.
The act threatened is a trespass, not merely because rail-
way tracks are to be laid in the highway, but because the
franchise claimed by this railway company as authorizing
the act is the grant of a new right of way distinct from that
of the highway. The State may do any act appropriate to
adapt the highway to the necessities of the public in the
exercise of the common right of passage for which it was
taken, and reasonable presumptions should be made in favor
of the validity of such acts ; if the alteration of the road bed
by constructing tramways therein should be necessary to the
exercise of this common right of passage, the landowner can-
not complain of the damage to his land done thereby ; it is
when his land is appropriated for a right of way vested in one
person, which is clearly distinguishable from the common
right of passage, that he is entitled to redress for actual in-
juries inflicted ; and in such case, while the landowner's
right to the special damage he may sustain therefrom as a
proximate and natural effect, is clear, the necessity in every
instance of such additional use of a formal sequestration of
the land as if no condemnation for any purpose had taken
place, is not so clear, and that question is not before us. In
the present case the plaintiff complains only of a threatened
invasion of his legal right by an act not authorized under the
highway easement as defined by statute and affirmed in
*Imlay* v. *Union Branch R. R. Co.*

The possible limitation by special circumstances, of his
right to protection by injunction, is a matter not now in-
volved.

Counsel for the defendant urged upon us the authority of a large number of cases in other jurisdictions, where the principle established in *Imlay* v. *Union Branch R. R. Co.*, has not been applied. While the decisions of our own courts are the only ones of binding authority, yet we are glad to seek in the decisions of courts in other States administering a similar law the valuable aid to be derived from conclusions reached by tribunals of such high character and from the argument which may support these conclusions. We have examined the cases cited and all others we have found bearing upon the subject, and studied them in detail with particular care. A review of each would be interesting, but out of place here. Some of these cases turn upon statutory and even constitutional provisions, which have no application in other States. In several, the question of the landowner's legal right is raised upon an application for injunction determined upon special facts found, and upon considerations which might properly be conclusive against granting the equitable remedy asked, but should not control the legal rights in an action at law. They do not agree upon any common principle. The diversity is marked. In some a distinction is drawn between the landowner's property covered by rural and urban highways; in a few cases this distinction is justified by statutes regulating the layout of highways or by constitutional provisions fixing the powers of municipalities, while in others it is intimated as founded on some vague general principles. In some cases the existence of the landowner's property is made to depend upon the motive power by which the railroad cars are moved; in others upon the degree of actual injury suffered by the landowner; and in others upon the degree of inconvenience suffered by the public.

It seems patent that these cases show no consensus of opinion which can be considered as authority upon the precise question at issue, *i. e.*, when a right of way over land is condemned by a statute defining the right taken and paid for, as a right in all citizens to pass and repass in the exercise of such means of travel as are common to all,—is the

peculiar right of way inherent in the franchise granted to a railway company included in this defined right? If the answer is to be controlled by settled principles of law, it would seem that the one given by the courts of Connecticut and New York must be given in every State which has the same common law in respect to highways, and similar statutory provisions as to their layout. If the answer is to be influenced by so-called "practical" considerations, a great diversity in the answers given by different courts is to be expected. So far as the landowner's direct interest in his land within the lines of the highway is concerned, the question is of little practical importance to him; the addition of the railway right of way to the public right of way involves no more than a nominal damage; and so far as his interest in the remainder of his land which may be consequentially injured is concerned, the question is ordinarily of slight importance to him, for in most cases the benefit exceeds the injury. But there are cases where the consequential injury to his other land may be great and even ruinous; and the real importance of the question to him lies in the fact that if the right of way taken by the public includes the railway right of way, he has no remedy for the injuries he may suffer, however great; but if the public right does not include the railway right, then the laying of the railway track on his land in the highway is an unlawful appropriation of his land, and his right to actual damage is protected by the Constitution. And so far as the interest of the public in combining within the same territorial limits facilities for railway travel and ordinary travel is concerned, the question is of slight importance; the execution of that policy cannot be seriously affected by payment of the just claims of those whose private property is thereby taken. The real importance of the question lies in the interest every member of the public has in maintaining in undiminished vigor the constitutional provision which protects private property from appropriation to public use without compensation. This provision expresses an axiom of common justice. The construction given to the language used—"property taken"—has somewhat narrowed

184     APRIL, 1897.

Canastota Knife Co. *v.* Newington Tramway Co. et al.     Vol. 69

its force as the declaration of a fundamental principle; if we further restrict it, by entering on a policy of construction which requires us to hold that the payment of damage done to property by its partial appropriation to a specific use presumptively includes payment for all damage that may afterwards be caused by the relentless " governmental act " in appropriating the property to another use not then contemplated or specified, we may find ourselves in a worse plight than if the application of the axiom of common justice had been left wholly to the mercy of the legislature without any attempt at constitutional protection. From this point of view the question is of vital importance to the public.

One or two cases cited adopt a rule easy of application and certainly effective. They hold that " highway," as used in the statutes establishing such way, is a word of expansive meaning, whose compass is coincident with the march of civilization; that the evolution of that meaning is retrospective in its effect regardless of vested rights, and that any use promoting communication between men by any method is included within the highway easement. One difficulty with our accepting this view is that in this State, as well as in other States possessing similar legislation, the fact assumed is not true; but on the contrary is palpably untrue. The principle established in *Imlay* v. *Union Branch R. R. Co.*, stands upon a solid foundation, which has not been shaken by any recent discussions. The same principle is held by the courts in New York, and arguments adduced in its support which seem unanswerable. *The Presb. Soc. in Waterloo* v. *Auburn etc., R. R.*, 3 Hill, 567 ; *Williams* v. *N. Y. C. R. R.*, 16 N. Y. 97 ; *Mahon* v. *N. Y. C. R. R.*, 24 id. 658 ; *Craig* v. *Rochester City & B. R. R.*, 39 Barb. 494, 39 N. Y. 404. The principle has been adopted in other States, but not always carried to its logical conclusion. *Sterling's Appeal*, 111 Pa. St. 35 ; *Penn. R. R.* v. *Montgomery Co. Pass. Ry.*, 167 id. 62 ; *Railroad Co.* v. *Williams*, 35 Ohio St. 168 ; *Indianapolis, etc. R. R.* v. *Hartley*, 67 Ill. 439 ; *Southern Pacific R. R.* v. *Reed*, 41 Cal. 256 ; *Ford* v. *Chicago, etc., R. R.*, 14 Wis. 609 ; *Carl* v. *Sheboygan, etc., R. R.*, 46 id. 625 ; *Reichert* v. *St. L. etc.*,

APRIL, 1897.                                185

Vol. 69    Canastota Knife Co. *v.* Newington Tramway Co. et al.

*Ry.,* 51 Ark. 491; *Kucheman* v. *C. etc., Ry.,* 46 Iowa, 366; *Hastings, etc., R. R.* v. *Ingalls,* 15 Neb. 123.

There are other questions closely related to the one under discussion, but not essential to its decision, to which perhaps I should allude as indicating the limits of the precise point now involved; but which are too important to be embarrassed by any discussion before they formally arise in a contested case. The combining of a railway and a highway within the limits of one way involves novel questions, some of which have not been settled or even discussed. The State in surrendering a portion of its property in the highway to the railroad company acts within its powers, but cannot thereby affect the owner of the land covered by the highway; do these conditions call for a modification of remedies that would be appropriate if the State had acquired no right whatever in the land? Considerations that have no application in dealing with a substantive right may have a legitimate bearing in dealing with the remedy. Possibly a solution of some fancied practical difficulties may here be found without departing from the primary principles of jurisprudence which are fully competent to deal justly with all complications engendered by rapid changes in environment, with no sacrifice either of private rights or of public interests.

The acts alleged in the plaintiff's complaint as threatened by the defendants would constitute a trespass and a continuing trespass on the plaintiff's land, and such a trespass may be restrained by injunction; for this reason the demurrer to the complaint was insufficient. Whether if the defendant had answered instead of demurring, a state of facts might have been proved which would require a denial of the equitable remedy, is a different question.

There is error in the judgment of the Superior Court.

In this opinion ANDREWS, C. J., concurred.