THE NEW YORK, NEW HAVEN AND HARTFORD RAILROAD COMPANY *vs.* THE FAIR HAVEN AND WESTVILLE RAILROAD COMPANY.

Third Judicial District, Bridgeport, April Term, 1898. ANDREWS, C. J., TORRANCE, HAMERSLEY, HALL and PRENTICE, Js.

Special damage to the land of an adjoining proprietor, caused by the location and operation of a railroad in the highway, constitutes an appropriation of his property for which compensation must be paid, notwithstanding the location of railroads of a certain character, found by the legislature to promote the ordinary use of a highway, may not be a taking of the land within the highway requiring compensation.

The General Assembly may authorize an electric railway to cross the tracks of a steam railroad at grade in a public highway, without providing for the payment of compensation to the latter for any inconvenience or damage resulting to it therefrom. The grant of such a privilege by the State confers no property right in the soil of the highway upon either railway company.

There is a material distinction between the power of the State to authorize the location and operation of an electric railway upon a turnpike or bridge causeway, and its power to authorize such location and operation upon a statutory, public highway. In the latter case the possessory right, disturbed by the railway, belongs to the State and may be relinquished without compensation; while in the former instance this possessory right constitutes the property of a private corporation and cannot be taken without making just compensation therefor.

The plaintiff, a steam railroad company, had, by condemnation and by deed, acquired the title to a certain parcel of land formerly owned by a toll-bridge company and across which its bridge causeway extended, subject to such legal rights of crossing as then existed. *Held* that the right to cross this strip with an electric railway, subsequently conferred upon the defendant by the legislature, was not excepted by the condemnation proceedings instituted by the plaintiff, and that the operation of an electric railway across this parcel and across the plaintiff's tracks at grade, ought to be enjoined until the defendant had compensated the plaintiff for the injury thereby caused to its property rights. *Held*, also, that the defendant's charter, neither in its original form nor as amended, contemplated the defendant's use of this property without making compensation therefor.

[Argued April 22d—decided June 17th, 1898.]

SUIT to restrain the operation of an electric railway upon the plaintiff's land, brought to the Superior Court in New Haven County and reserved by that court, *George W. Wheeler, J.,* upon an agreed statement of facts, for the consideration and advice of this court. *Judgment advised for plaintiff.*

The case is sufficiently stated in the opinion.

*Henry Stoddard,* for the plaintiff.

The case at bar is radically different in its essential features from the case of the *Canastota Knife Co. v. Newington Tramway Co.,* 69 Conn. 146. In the present case the defendant is under a contract obligation to remove its tracks. The causeway at the point in question is the property of the plaintiff, and has been devoted to the chartered purposes of the plaintiff, since about 1840, as a means of access to its steamboat wharf, and for switching and freight-yard purposes. These purposes are exclusive in their nature, and are of the essence of the continued discharge and exercise of plaintiff's corporate duties and functions. In addition to this contractual relation there is a special, peculiar and exceptional damage resulting to the plaintiff from the location and operation of defendant's railroad. There is also the further element in this case that such use by the defendant and the operation of its tracks across the plaintiff's tracks is, in substance, a public nuisance. The language is: "The said use by the defendant and by the plaintiff of said tracks is dangerous to public safety and the danger will hereafter be increased." The practical fact that is to be dealt with here is that a condition exists where either the plaintiff or the defendant must give way. The property is not capable of the double use to which it is sought to be put, and either the plaintiff or the defendant must be regarded as the owner of the premises and entitled to the use thereof to the exclusion of the other.

*George D. Watrous* and *James D. Dewell, Jr.,* for the defendant.

The plaintiff is not the owner in fee of the *locus in quo.*

The westerly approach to the bridge, called the causeway, started at high watermark at the foot of two public highways. From that point to the opposite shore, the title to the land was in the State. The causeway, including the *locus in quo*, was built out directly from these `highways. The public ferry was changed into a toll road and bridge, by the act of the legislature. The public had the same right to pass over the bridge and the approaches thereto, upon the payment of toll, as it had to pass over the ferry. One means for facilitating public travel made way for another. There is nothing distinguishable in the law between a toll-bridge and a turnpike. *Walker* v. *Caywood*, 31 N. Y. 51, 58; *Murray* v. *County Com'rs*, 12 Met. 455; *Com.* v. *Wilkinson*, 16 Pick. 175; Jones on Easements, § 421; Elliott on Streets, 53–55. The plaintiff obtained whatever rights it may have had in or to Bridge street, by a deed from the Bridge Company; and had only such rights as the Bridge Company had in and to Bridge street. But the Bridge Company never obtained any legal right to the flats upon which the causeway is built, and consequently the plaintiff company has no legal right to the part of Bridge street which it occupies with its tracks. If the plaintiff did obtain a good title—a fee—to the part of the causeway crossed by the tracks, its long silence in not objecting to the use the public was making of this causeway over its tracks, is decisive of its intention to dedicate the land to highway purposes. While intention and not time is the essential element, yet time is important as showing the intention, especially where, as here, twenty-six years have elapsed. *Noyes* v. *Ward*, 19 Conn. 250; *Green* v. *Canaan*, 29 id. 157; *Guthrie* v. *New Haven*, 31 id. 308, 321; *N. Y., etc., R. Co.* v. *New Haven*, 46 id. 257, 262; *Hall* v. *Meriden*, 48 id. 416, 428; *Cromwell* v. *Conn., etc., Co.*, 50 id. 420; *Spencer* v. *New York & N. E. R. Co.*, 62 id. 242. This highway has been in continuous use since 1799, and since 1822 without the payment of toll unless the user passed the toll gate. It is utterly impossible to deny the existence of a legal highway, with all of its incidents. An electric railway, as such, in the public highway,

does not impose an additional servitude upon the land of the abutting proprietor, even if he owns the fee. *Canastota Knife Co.* v. *Newington Tramway Co.*, 69 Conn. 146, 157; *Taggart* v. *Railway Co.*, 16 R. I. 668. This particular electric railway does not impose an additional servitude upon the land of this particular plaintiff, even if it be the owner of the fee. The only contention of the plaintiff is that it is the *use* and *operation* of the railway which causes the damage to it. Here, too, it is distinctly conceded that the damage is not due to the use of electricity or of two tracks rather than one. The plaintiff's grievance is based entirely upon the peculiar use which it makes of the crossing and the adjoining property; not at all upon any unusual or exceptional manner in which the defendant's railroad is operated at that place. The question of danger is a legislative or administrative one, and is entirely eliminated from this case by the action of the legislature, the railroad commissioners and the municipal authorities.

HAMERSLEY, J. In the case of *Imlay* v. *Union Branch Railroad Co.*, it was held that "to subject the owner of the soil of a highway to a further appropriation of his land to railway uses, is the imposition of a new servitude upon his estate, and is an act demanding the compensation which the law awards when land is taken for public purposes." 26 Conn. 249, 259.

The doctrine established in this case has since been treated as settled law; and was affirmed in the very recent case of *Canastota Knife Co.* v. *Newington Tramway Co.*, 69 Conn. 146. In the latter case a distinction is drawn in respect to that class of street railroads that can "be so built and operated as to serve the public, without injury to the landowner." The precise question at issue was the right of the plaintiff (owner of the land covered by the highway) to an injunction restraining the defendant from building a railroad in the highway under authority of a charter which did not contemplate "the construction of a railway in such a manner as substantially to obstruct ordinary highway travel, or necessarily to

cause special damage to any landowner," when in the complaint " it is not alleged that it is intended to construct it so that any of those effects would be produced." The precise point decided was that an injunction would not issue in such case, because the plaintiff was not entitled to compensation for the disturbance of the soil in the highway made under authority of the State for such purpose. It was assumed that the power of the State to control the land within the lines of its highways, so far as may be necessary to promote their use for public travel without derogating from the general privileges belonging to the public, may be exercised in giving to a railroad corporation the right to lay its tracks in the highway for the purpose of operating a street railroad of the harmless kind indicated; that this new use, although not identical in every particular with the common use for which the way was laid out, may nevertheless be so far identical as to justify the State in so regulating the surface of the highway; and that in such case the owner of the fee is not in fact injured in respect to his land within the highway, and is entitled to no compensation. But the property injured by the layout of a highway, or by its appropriation to a new use, is not simply the land within the lines of the way, but the whole land which is burdened by the way. Compensation is not made merely for depriving the owner of exclusive possession of a strip of his land, but also for the special damage done to his remaining property, by the use of that strip. The compensation for the property taken is measured by the net damage to the whole piece of land. *Trinity College* v. *Hartford*, 32 Conn. 452, 478. For a period long anterior to the adoption of our Constitution, we have recognized these two descriptions of property and elements of compensation. *Peck* v. *Smith*, 1 Conn. 103, 112. And even when the fee of the highway is in the public, the interest of the adjacent lot owners which may be damaged has been held to be property, for the injury of which compensation must be made. *Crawford* v. *Delaware*, 7 Ohio St. 459. And so in the *Canastota Knife Co.* case, in holding that the residuum of possessory right in the owner of the fee is not necessarily invaded by the State

in authorizing the construction of a railroad in the highway, it was also held that the property of landowners appropriated through special damage caused by the construction or operation of the railroad, must be paid for.

On this subject the court says: "Two rights are to be guarded with equal care,—that of the individual landowner, and that of the public at large. . . . A street railway may be so constructed and operated as to be a proper means of facilitating public travel. It may also be so constructed, but not so operated. It is, in such case, a means that may be and is abused; but for any abuse the law can supply the remedy. Nor would the legislative grant, in such a case, avail to deprive the owner of the soil of his right to compensation. . . . If either the mode of construction or of operation be such as to make it a substantial impediment to public travel *or a proximate cause of special damage*, of a new description, to the owner of the soil, the law will give redress. . . . If special and peculiar damage is done or threatened to any particular landowner, whether the proprietor of the fee in the highway or of adjoining land, his rights of action are clear and certain." And it is stated as a reason for refusing the injunction, that the complaint did not allege that the contemplated railroad would necessarily cause special damage to any landowner.

The case rests on two propositions which must be taken together: one, that the State may authorize the construction and operation of railroads of a certain description within the highway, without invading the possessory rights remaining in the owner of the fee; and the other, that when a private corporation as grantee of such franchise causes special and peculiar damage to any landowner, compensation must be made. This conclusion presents a practical method of dealing justly,—guarding "with equal care the rights of the individual landowner, and of the public at large,"—with the novel questions arising from combining within the same territorial limits facilities for railway travel and ordinary travel; and as a practical result was substantially approved by all the judges, although they differed somewhat widely as to the

considerations which might most reasonably and logically lead to such a result.

In the present case the plaintiff alleges that the defendant has, without making compensation therefor, constructed a double track electric railroad upon its land, and claims a perpetual injunction restraining the operation of the road, and an order requiring the defendant to remove its tracks. The defense is that the land occupied by the defendant's tracks is a public highway, and is so occupied by authority of the legislature. The complaint also sets out that the alleged highway is crossed by the plaintiff's railroad tracks, and the special damage alleged is largely confined to that arising from a dangerous grade crossing.

If the only interest of both the plaintiff and defendant were a right, derived from the State, of passing over a highway, the one transversely and the other longitudinally, such elements of damage could hardly be the subject of compensation unless by force of special legislation. *New York, N. H. & H. R. Co.* v. *Bridgeport Traction Co.*, 65 Conn. 410, 432. They can be considered only in connection with some deprivation of a property right. There is nothing in the record to distinguish the defendant's road from the harmless street railroad contemplated in the *Canastota Knife Co.* case, unless it be its injurious effect on the property of landowners. The plaintiff (assuming its land to be covered by a public highway) is not entitled to injunction or compensation for the mere occupation of that land by the tracks of the defendant. There must be some peculiar and special damage done to the property of the plaintiff. It is doubtful, at least, whether such special damage is sufficiently alleged in the complaint, although it is found in the agreed statement of facts. If, therefore, the defense were clearly supported by the facts found, we might properly deny the injunction; leaving the plaintiff to its legal remedy for such special damage as it may have sustained. But this defense is not clearly supported. The finding of facts presents a most exceptional case.

The alleged highway which the defendant has occupied,

extends from the junction of Bridge and Water streets in the city of New Haven, easterly to a bridge structure over navigable waters connecting New Haven and East Haven; and was originally a causeway built as part of a toll-bridge, extending from high water-mark near the junction of Bridge and Water streets, to East Haven. The easterly and larger portion of this causeway is conceded by the parties to be now a public highway. The controversy is in respect to the westerly portion, where the use of the defendant's road makes the very dangerous grade crossing described. The following sketch of the plaintiff's land upon which the controversy turns (marked on the exhibit as parcel B,) will illustrate the situation.

(The defendant's tracks from Y to Z are laid on a conceded highway; from Y to X they cross the plaintiff's land known as parcel B; from X westerly they are laid on a highway. The plaintiff's railroad tracks cross as indicated.)

It appears that prior to 1796 there was a public ferry between New Haven and East Haven, having its western terminus at or near the present junction of Bridge and Water streets, with a public highway leading thereto. It does not appear that this landing was in fact interfered with by the bridge, or that the ferry could not be used or was not used after the construction of the bridge. No inferences affecting the present question can be drawn from the mere existence of the ferry. In 1796 " The Company for Erecting and Supporting a Toll Bridge from New Haven to East Haven " (hereinafter referred to as the Bridge Company) was incorporated. It was authorized to erect a bridge across from New Haven to East Haven; to collect the toll specified from all persons using the bridge; to continue the collection of such toll for seventy years, when no more toll was to be collected than the General Assembly should then adjudge to be sufficient to keep the bridge in repair (this term was in 1805 extended to 150 years). It was also authorized, for the purpose of carrying the Act into effect, to purchase and hold lands not exceeding one hundred acres. 1 Private Laws, 241. This charter was accepted, and as early as 1799 the corporation completed its bridge from New Haven, at high water-mark near the western boundary of parcel B, across the navigable waters to the East Haven shore. The westerly 1,230 feet consisted of a causeway about fifty feet wide. This charter could not be altered at the pleasure of the General Assembly (except so far as any property may be reached in the exercise of the police power);—and in amendments enacted subsequent to our Constitution the legislature has expressly provided that the acceptance of such amendment shall not operate to subject the charter to such alteration. After the construction of the causeway and prior to 1840, the Bridge Company obtained the title to the flats and the structures thereon, embracing the locality and the territory upon all sides adjacent thereto; and from time to time filled in said flats and built and extended wharf property thereon, on both sides of said causeway. The Bridge Company was authorized by its charter to acquire and hold this land. Said wharf

property is generally known as Belle Dock or Steamboat Wharf, and is the terminus of the plaintiff's railroad connecting its land with water travel. The Hartford & New Haven Railroad Company, now merged in the plaintiff corporation, was chartered in 1833, with authority to construct a railroad "to the navigable waters of New Haven harbor, at some point between the canal basin and the west end of Tomlinson's bridge, so-called," *i. e.*, the bridge in question; and also to purchase and hold steamboats to be used in connection with their road. 4 Private Laws, 900. In 1840 the H. & N. H. R. Co. purchased and by deed obtained the right to the full and unrestricted use of all and so much of the lands, wharfs, flats and other property of the Bridge Com pany, as at any time it might have occasion to occupy in order to construct and maintain its railroad to navigable waters and to operate its railroad in connection with steamboats for the carriage of passengers or freights. In pursuance of its charter and of the rights acquired by this deed, the Railroad Company built its tracks to navigable water, occupying for passage, freight houses, stations, etc., the causeway, lands, flats, wharfs, etc., of the Bridge Company. Soon after 1850 the Railroad Company ceased to run its passenger trains to the steamboat wharf and in 1861, upon application of the Attorney for the State, the Superior Court by mandamus compelled the company to so run its trains (29 Conn. 538), and since then its trains have been run in obedience to that mandate. In 1868 it became necessary to widen and extend the depot grounds of the H. & N. H. R. Co., then lying northerly of the Bridge Co.'s property, so that they should include parcel B and extend to tidewater, and the company applied for condemnation proceedings. The railroad commissioners, empowered by statute to authorize the condemnation, found that public necessity required the taking of two pieces of land, *viz.*, parcel B, and a strip connecting with that, extending along the southerly line of the causeway to the wharf. This land was duly condemned, as was also the right of ingress to and egress from all parts of the above described grounds by and over

all parts of the causeway or roadway owned by said Bridge Company and lying adjacent to said above described grounds, for the use of said Railroad Company, its servants and all persons having business with it. The condemnation of parcel B was made "subject to whatever rights of crossing the same now exist by law." Shortly afterwards the Bridge Company, by quitclaim deed, conveyed to the Railroad Company "the entire residuum of title and interest in the above described premises now remaining in said releasor." Prior to this condemnation the Railroad Company had merely the right to cross the causeway of the Bridge Company, derived both from its charter and the deed of 1840. But upon the condemnation, its depot grounds were extended over the property of the Bridge Company to the wharf at tide-water, including the strip 110 feet long that had been used by the Bridge Company as a part of its bridge. The exclusive use of all this land for the purposes of depot grounds was vested in the Railroad Company by authority of the State, and the absolute title for all purposes was vested by virtue of the deed of release.

The only limitation on absolute ownership is such rights of crossing the land included in parcel B, as "now exist by law." The only right of crossing then existing by law, was that connected with the use of the toll-bridge. The ownership of the Bridge Company passed to the Railroad Company, but that ownership was coupled with an obligation to permit and maintain a passage for the uses of the toll-bridge as then existing by law; and the finding states that since the deed of release of 1868 the plaintiff has used, maintained and repaired the 110 feet of the causeway included in that deed; thus fulfilling the obligation of the Bridge Company.

It is suggested that because, when the bridge was first constructed, the toll-gate was placed at the extreme western end, and in 1820 was moved 1,200 feet easterly and placed near the commencement of the bridge structure proper, a dedication of that 1,200 feet of causeway as a public highway must be inferred. The location and change of the toll-gate depended on the will of the company,—in this respect

differing from toll-gates on ordinary turnpikes; its rights
in the bridge, which included the causeway, remained un-
changed, wherever the toll-gate might be, so long as its
charter obligations were fulfilled; nor were they affected by
allowing a portion of the public to pass to the company's
wharf property; neither the bridge nor the wharf property
could thus be made public property. Dedication implies
intention on the part of the owner and acceptance by the
public. Here there was neither. *Williams* v. *New York &
N. H. R. Co.*, 39 Conn. 509.

It is claimed that in 1868 the defendant was entitled by
law to cross parcel B, with its railroad tracks. This claim
may include the claim that there is no distinction between
the power of the State to authorize the construction of a
railroad upon a turnpike or a toll-bridge, and its power to
authorize a railroad upon a statutory highway. We think
there is a material difference, although in some reported
cases it seems to have been overlooked. The difference is
this: in the one case the possessory right disturbed by the
railroad belongs to the State, and in the other it belongs to
a private corporation. The establishment of every public
highway (whether by layout or dedication), involves in the
State a duty of maintenance and a power to do all acts inci-
dent to the performance of that duty. In the construction
and maintenance of a highway a valuable property is accu-
mulated which belongs to the State or its agents. This
interest of the State in a highway may be given away by the
State without compensation, unless its agents have acquired
a vested right. But in the case of a turnpike, the right and
duty of maintenance included in the franchise, and the ac-
cumulation of property in the construction and maintenance
of the road, belongs to a private corporation. It constitutes
property in that corporation entitled to protection. *A for-
tiori* is this true of a toll-bridge. A bridge-way not one mile
in length might cost $500,000 to construct, and is property
both in the value of the franchise and in material. It is
difficult to see how the State can, without compensation,
appropriate this, any more than other property, to the uses

of another corporation. The charter of such a corporation may be forfeited, as any charter may ; but the property belonging to the corporation cannot be confiscated in whole or in part. This view is indicated in *Sherwood* v. *Weston*, 18 Conn. 32, 47. But we fail to find in the defendant's charter any authority to use this bridge-way without compensation. It was granted in 1860 (5 Private Laws, 370), and authorized the defendant to build a single or double track railroad on certain specified streets ; and also to construct a branch from the junction of Grand and East streets through East street to Bridge street ; thence through Bridge street to the steamboat landing. At that time Bridge street terminated at the commencement of the Bridge Company's property. There is nothing in the record to indicate that the bridgeway was then known as Bridge street. On the contrary, Bridge street is said in the finding to abut on the bridge property, and is so described in the condemnation proceedings of 1868 ; and the defendant, in a document signed by it in 1866, says that it has built its railroad to a point near the lower end of Bridge street and is desirous of extending the same to and along the causeway of the Bridge Company to a point near the steamboat landing. It is evident that the legislature did not attempt to authorize the defendant to lay its tracks over any property of the Bridge Company without compensation ; and for this reason, if not for others also, the defendant was given power to take land and property by right of eminent domain. The charter says it shall be vested with the powers and privileges and be subject to the duties, so far as applicable to a horse railroad, expressed in an Act relating to railroad companies, passed in 1849. Section 10 of that Act provides that " every railroad corporation shall be liable to pay all damages that shall be occasioned by laying out, making and maintaining their road," and after describing the mode of appraisal, says : " *Provided*, that no railroad shall be worked upon, or opened across the lands of any person, until the damages assessed to such person shall have been paid, or secured to be paid to his satisfaction, or deposited with the treasurer of the county for his use." That

these provisions—as applicable to a horse railroad as to a steam railroad—became a part of the charter, is made clear by the provisions of § 6 of the charter giving additional facilities for condemnation in respect to property of *feme coverts*, infants, etc.

In 1865 the defendant undertook to lay its tracks upon the causeway of the Bridge Company across parcel B, and was stopped by a temporary injunction obtained by the Bridge Company. Thereupon, and upon application of the defendant, the Bridge Company, with the consent of the Railroad Company, made an agreement with the defendant, dated April 25th, 1866, whereby the Bridge Company agreed to permit, upon the conditions set forth, the defendant to extend the track of its horse railroad across the tracks of the N. H. & H. R. Co., and along the causeway to a point near the wharf; and the defendant agreed to construct and maintain such arrangements for crossing the tracks of the Railroad Company as should be approved by its superintendent, and to repair and care for that portion of the causeway occupied by its track, to the satisfaction of said superintendent. The agreement then stated: " It is understood that it is not intended to convey to said Fair Haven and Westville Horse Railroad Company by this instrument any right or interest in or to the said causeway, or to the land over which said horse railroad track may be laid, but simply to grant, for the public accommodation, to said railroad company, the privilege of constructing and operating said horse railroad thereon for an indefinite term. And if at any time hereafter it shall be deemed by the board of directors of said bridge company that the public accommodation does not longer require said horse railroad track to be continued on said causeway and property of said bridge company, or if for any other reason said board of directors shall be of opinion that it is expedient that said horse railroad track should be removed, said directors may give notice of such decision to said railroad company, and thereupon within six months from the day of giving such notice, said tracks shall be removed by said horse railroad company, and the privileges thereby granted

shall cease and be determined." And the agreement further stated that the defendant assented and agreed to the above conditions, and accepted the privileges granted subject thereto. This agreement was signed by the Bridge Company and by the defendant. In 1882, by agreement between the defendant, the Bridge Company, and the plaintiff, a change in the position of the track on the causeway was authorized, "all the conditions and limitations of said original permit to remain in full force both as to said original and this additional permit." The defendant occupied the causeway under this license until 1893, when by vote of the directors of the Bridge Company the license was revoked and notice given to the defendant. The horse railroad track has been removed, and a double track electric railroad has been laid.

In 1886 the Bridge Company sold and conveyed to the city and town of New Haven, its toll-bridge and causeway, bounded westerly by parcel B belonging to the plaintiff, and easterly by high water-mark on the easterly side of New Haven harbor, the municipal corporations agreeing to maintain the same as and for a public highway until the same be legally discontinued; but upon such discontinuance the same, disburdened of the servitude of such use, was to revest in the releasor as fully as if the deed of conveyance had never been executed. This sale was made in pursuance and under authority of a special Act passed in 1867, authorizing the Bridge Company " to sell and dispose of said bridge, or any part thereof," to the town and city of New Haven, or to such person or corporation as may desire to purchase the same. The Act provided that its acceptance by the Bridge Company as an amendment to its charter should not affect the inviolability of the original charter or any amendments thereof; also that a sale under authority of the Act should not impair in any manner the rights of the company to all its property not sold under authority thereof, but that all such property should be and remain vested absolutely in such company. 6 Special Laws, 182. After this sale and down to the present time, the city of New Haven has maintained said causeway so purchased and lying east of parcel

B, as a public highway; and the plaintiff has continued. as before and since 1868 to use, maintain and repair that part of the bridge or old causeway not sold to the city and lying within parcel B.

In 1895 the General Assembly authorized the merger of the Bridge Company and the plaintiff, and the plaintiff has succeeded to all rights, franchises and property granted and belonging to the Bridge Company, subject to the duties imposed upon the same by its charter and amendments thereto. 12 Special Laws, 632.

The defendant has no authority to lay its double track electric railroad, by virtue of the conditional permit given it to lay a horse railroad track in 1866. It has no authority to lay such track under its original charter, without first making compensation. The sale to the city of New Haven of a part of the bridge in 1886, does not give the defendant or the municipal corporation any rights in respect to the part, not sold, and belonging to the plaintiff since 1868. If a city sees fit to lay out a new highway so that its use depends in part on a limited right of crossing private land, defined by matter of record, and does not see fit to lay out any highway over that land, the rights of the owner cannot be affected by the construction of the new highway, or by its use in connection with the crossing of his land in pursuance of the rights of crossing established and recorded.

The defendant claims, however, authority to lay its tracks under an amendment to its charter passed in 1893. That amendment authorizes the defendant to lay its tracks in a large number of streets specifically named, not including the crossing of the plaintiff's land. That right is claimed from a general clause which authorizes the defendant " to lay a second track in those streets of the city and town of New Haven which it now occupies with a single track, except West Chapel street." 11 Special Laws, 1040. The crossing on the plaintiff's land is not a street, within the meaning of the Act authorizing the use of a highway without compensation ; that is, this crossing is not a public highway of which the State, either by itself or public agencies, has complete

control for all purposes of maintenance or repair and is the owner of the property accumulated in the construction and maintenance of the way. Such franchise and property, by force of the charter of 1796, was vested in the Bridge Company; and is now vested in the plaintiff. It was not the purpose of this general clause to adjudicate any question of title, or to alter the defendant's charter in respect to its power to take land, or lay its tracks without compensation; it simply authorized a second track to be laid under the same restrictions of charter and law applicable to a track already laid. It is doubtless true, and this appears more clearly from other parts of the amendment, that the legislature intended to authorize the defendant to cross the plaintiff's land where it has laid its tracks; and we assume that the defendant has such authority. But the granting of that authority cannot alter the nature of the plaintiff's ownership. The plaintiff clearly has whatever rights of property belonged to the Bridge Company in 1868; and the Bridge Company had then a property interest which could not be taken without compensation. But the title of the plaintiff is derived not only from the Bridge Company, but from the State, which in the exercise of the power of eminent domain authorized the plaintiff to acquire the ownership and exclusive use of all this land, subject only to such rights of passage over the same as existed by law in 1868. The railroad commissioners were authorized by the State to condemn this land for depot grounds and, for the same purpose, to condemn a portion of the Bridge Company's bridge; or, if there had been a highway there, to condemn the highway. *State* v. *Railroad Com'rs*, 56 Conn. 308, 314. For the property so condemned the plaintiff had to pay the damages ascertained according to law; and upon such payment the property condemned belonged to the plaintiff, and could not afterwards be taken away by the State without compensation. As the railroad commissioners had the power to condemn a bridge-way or a highway absolutely, they had the power to condemn it conditionally; and this course they pursued.

It is now claimed that after a lapse of twenty-five years,

after the plaintiff has invested large sums in adapting its land to the uses to which it was condemned, after an exclusive use for that purpose has become almost a necessity, the defendant can divide the depot grounds by a double track electric railroad and occupy the plaintiff's land without compensation; and that this use of the plaintiff's land is a "right of crossing" existing by law in 1868. This claim rests on the theory that there was no condemnation of any way; that the bridge-way was the exact equivalent of a public highway; and therefore the State may authorize the laying of the railroad tracks without compensation to the plaintiff.

This theory is wholly wrong. We have called attention to the material distinction between a bridge-way and a public highway; and there can be no question but that the bridge-way was in fact condemned. The Bridge Company had no subsequent control of that way; all power of control and every right of property became, by the condemnation, vested in the plaintiff. The bridge-way became a part of the plaintiff's depot grounds, subject only to the condition of the condemnation, i. e., such "rights of crossing as now exist by law." This language cannot be construed as meaning the "bridge-way now existing," and certainly not as meaning the "highway now existing;" it must be construed consistently with the fact of condemnation of an existing way. That way existed by law and was condemned by law; but there were rights of crossing the land so condemned, then existing by law, in each one of the public having occasion to use the bridge; those rights were continued, but in all other respects the way was condemned and became the property of the plaintiff.

The reasonableness and necessity of such a construction is apparent when we consider the purpose for which the condemnation was made, and the surrounding circumstances. The exclusive use of the land necessary for depot grounds, was provided for by the condemnation of the way; the continued use of the bridge, by a reservation of the existing rights of crossing. These rights had no reference to the power of the Bridge Company, as agent of the State, over

the way as a highway,—that was condemned and paid for by the plaintiff; the rights referred to are those of crossing then secured by law to each member of the public having occasion to use the bridge. The right to cross this land with a railroad, which could only exist by force of future legislation, was not a right of crossing then existing by law within the meaning of the Act of condemnation.

The plaintiff has done nothing to qualify its rights of property acquired in 1868. It has fulfilled its obligations in respect to the crossing to which its land is subject, and has maintained and repaired that crossing as the owner thereof; nor does it appear that either the State or city of New Haven has exercised in respect to the crossing any duty of maintenance as the owner of a public highway. In view of all these special circumstances, we think the plaintiff stands in a different position from that of an adjoining proprietor owning the fee of an ordinary public highway; that it has a property in this crossing which the defendant has taken; that the defendant's charter as amended did not authorize it to take this property without compensation, but, on the contrary, made it liable for all damages occasioned by making its road, and provided the method for appraisal of such damages; and also provided that the road should not be opened across the lands of any person without compensation for damages. If the charter makes an appraisal a condition precedent to opening the road across the plaintiff's land, the injunction asked for must be granted, but if the charter cannot be so construed, granting the injunction may be a matter of discretion. In either view, we think an injunction should be granted.

The finding states that in 1893, when the defendant's permit to use a single track horse railroad was revoked, it had become necessary to the safe management of the plaintiff's road, to stop the use of said crossing by the defendant and its cars; that such crossing and use of the plaintiff's property and tracks by the defendant, seriously interfered with the management of the plaintiff's business and the proper use of its property and safe operation of its road; and that this use of the plaintiff's land by the defendant materially dimin-

ishes to the plaintiff the value of its property and depot grounds. Upon this state of facts an action for damages would not be an adequate remedy.

It appears that the defendant has obtained from the railroad commissioners an approval of the grade-crossing, and from the authorities of New Haven an acceptance of its plan of construction. These proceedings are necessary to the construction of the road, but have no relation to the defendant's right to take the plaintiff's property without compensation.

The Superior Court is advised to render judgment granting the prayer of the plaintiff's complaint; the terms of the injunction, consistent with the enforcement of the plaintiff's rights as decided, to be settled by the Superior Court after a hearing for that purpose.

In this opinion ANDREWS, C. J., and HALL, J., concurred.

TORRANCE, J. (dissenting). In this case I feel obliged to dissent from the conclusion reached by a majority of the court, that the plaintiff is entitled to an injunction. The *locus in quo* is a small piece of land near the westerly end of what is called the "causeway" leading to "Tomlinson's Bridge," so-called, and lies wholly within the limits of said causeway. It is now crossed by certain tracks of the plaintiff and by the double tracks of the defendant's electric street railway. The plaintiff asks for an injunction to restrain the defendant from operating its street railroad over the *locus*, and an order requiring it to remove its tracks therefrom. The defense is, that the *locus* is a public highway and is occupied by the defendant under the authority of the legislature. With reference to this defense the majority opinion says this: "The plaintiff (assuming its land to be covered by a public highway) is not entitled to injunction or compensation for the mere occupation of that land by the tracks of the defendant. There must be some peculiar and special damage done to the property of the plaintiff. It is doubtful, at least, whether such special damage is sufficiently alleged

in the complaint, although it is found in the agreed state-
ment of facts. If, therefore, the defense were clearly sup-
ported by the facts found, we might properly deny the
injunction; leaving the plaintiff to its legal remedy for such
special damage as it may have sustained. But this defense
is not clearly supported."

The defense, as before stated, was (1) that the *locus* was
a public highway; (2) that it was occupied by the defend-
ant for a street railway by legislative authority. Upon the
facts found it is clear, and is not disputed, that this second
part of the defense is true. The defendant's tracks were
laid there and it operates its road there, by legislative au-
thority. The only question then is whether the first part of
the defense—that the *locus* is a public highway—is supported
by the facts agreed upon. If it is, the majority opinion con-
cedes that the injunction ought not to issue.

The main facts bearing upon this point are these: The
Bridge Company was incorporated in 1796 to build and
maintain a bridge across New Haven harbor to East Haven.
In 1799 it built and completed a bridge, and a causeway
leading to it, from the present junction of Bridge and Water
streets in New Haven. The causeway was about fifty feet
wide and about twelve hundred feet long. When this was
done the Bridge Company erected a toll-gate at the westerly
end of the causeway, and took toll there. In 1822 the Bridge
Company removed the toll-gate to a point near the westerly
end of the bridge, where it remained until the bridge was
made a free bridge, in 1886. Prior to 1840 the Bridge Com-
pany obtained title to the flats in the vicinity of the bridge,
filled them up and reclaimed the land, and built public docks
or wharves there and otherwise used the reclaimed land as its
own. In 1840 the plaintiff acquired the right from the
Bridge Company, to use such property of the Bridge Com-
pany in the vicinity of the causeway as it might require for
railroad purposes, and in connection with its use, of the
docks there. Under the rights thus acquired the plaintiff,
in 1841, laid its tracks across the westerly end of the cause-
way substantially where they now run. In 1865 the defend-

ant attempted to lay its tracks for a horse railroad upon the causeway, crossing the tracks of the plaintiff, and was stopped from so doing by an injunction procured by the Bridge Company. Thereupon the Bridge Company, with the consent of the plaintiff, granted to the defendant a written license to lay its tracks there, under which license, accepted by the defendant, it laid and operated its horse railroad until said license was revoked by the Bridge Company in 1893.

Upon the facts found, I do not think this license has any bearing upon the question whether the causeway was or was not a public highway, and it may therefore be laid out of the case.

In 1868 the plaintiff brought proceedings to condemn and did condemn and take two certain described pieces of the Bridge Company's property in the vicinity of the causeway. One of these pieces, the smaller one, is the only one we are here concerned with, as it includes the *locus in quo*. This piece is known in the record as parcel B. The precise *locus in quo* is a small part of parcel B near the westerly end of the causeway, and lying wholly within the limits of the causeway, substantially covered by the crossing tracks of the plaintiff. Parcel B was taken by the plaintiff under its condemnation proceedings, "subject to such rights of passage over the same as now exist by law." This is the language used by the plaintiff, and it is clearly broad enough to include a public highway, if one then existed over parcel B. Subsequently in the same year (1868) the Bridge Company conveyed to the plaintiff by deed whatever residuum of rights it had, if any, in parcel B, which had not been taken by the condemnation proceedings.

So far as the persent question is concerned, I think this deed conveyed nothing to the plaintiff. It had already acquired whatever rights the Bridge Company had in parcel B. It is under the condemnation proceedings and this deed that the plaintiff claims to be the owner in fee of the *locus in quo*, free from the servitude of a highway, at least so far as the defendant is concerned. In 1886 the Bridge

Company, under the authority of the legislature, conveyed to the city and town of New Haven all its right, title and interest in and to the bridge and causeway, "as and for a public highway, free to the use of all the public as all other highways of said city and town now are." It thus appears that from 1799 down to 1898 the entire causeway and bridge formed part of a public highway; not a free public highway, it is true, because toll was exacted if you crossed the bridge, until 1886, but still a public highway. The Bridge Company could neither close it nor dispose of it without legislative authority. It is conceded that all the rest of the causeway east and west of the *locus in quo* is now a free public highway, for all purposes. The plaintiff admits, for the purposes of this case at least, that the *locus in quo* is a public highway for all purposes and uses except the purposes and uses of a street railway. How did the causeway become a public highway? Not by the deed of the Bridge Company to the city and town in 1886; that only made it a free road. It has been a public highway since 1799 by virtue of its layout and maintainance by the Bridge Company as the agent of the legislature, and it has been a free public highway since 1886.

The claim of the plaintiff is that a small part of the causeway is not a highway for the purposes and uses of a street railway, while all the rest of it is a highway for all purposes and uses. I am unable to see any reason for making a distinction in this respect between the *locus in quo* as part of the causeway, and any other part of the causeway. If the one is a public highway the other is also. Upon the agreed facts, then, I think that the entire causeway in 1868 was subject to the servitude of a public highway, and that the plaintiff took the *locus in quo* and holds it subject to that servitude. For this reason I think the defense put forward is fully supported by the agreed facts; and if this be so the majority opinion concedes that no injunction should issue, even if the plaintiff is entitled to damages for the acts of the defendant.

But I dissent entirely from the further conclusion reached

in that opinion, that upon the agreed facts the plaintiff's rights have been so invaded by the acts of the defendant as to entitle it to damages under the principles laid down in the case of *Canastota Knife Co.* v. *Newington Tramway Co.*, 69 Conn. 146. In laying its track over the *locus* and in operating its railroad there, it is conceded that the defendant has fully complied with all the requirements of the law. The majority opinion concedes that "there is nothing in the record to distinguish the defendant's road from the harmless street railroad contemplated in the *Canastota Knife Co.* case, unless it be its injurious effect on the property of landowners," meaning, I suppose, the plaintiff. That opinion further concedes that the plaintiff is not entitled to compensation for the mere occupation of its land by the tracks of the defendant; that there must be "some peculiar and special damage done to the property of the plaintiff" to entitle it to damages; and that it is doubtful whether such special damage is sufficiently alleged in the complaint. It states, however, that the agreed facts show such special and peculiar damage resulting to the plaintiff here. I cannot assent to this.

The agreed facts show that the tracks of the plaintiff over the *locus in quo* are not its main line tracks. They lead to its freight yard and freight depots, and are used mainly for freighting and switching purposes. In the agreed statement of facts, the "peculiar and special damage done to the property of the plaintiff" is set forth in paragraphs 21–26 and 29. These statements amount to this, in substance: Owing to the growth of the city, the use of this crossing by the general public and by the defendant has greatly increased of late years and will continue to increase; and owing to the increase of the plaintiff's business, its use of this crossing and of its freight yards and depots adjoining has greatly increased and will continue to increase. This use of the crossing by the general public and by the defendant seriously interrupts, delays and obstructs the plaintiff's business here, and interferes with the proper use of its property, and the proper, safe and economical operation of its road. It makes

this a very dangerous grade crossing. It imposes expense upon the plaintiff "in providing watchmen, gatemen, train-hands, and safeguards to reduce as far as possible the danger and damage to the public and to itself."

These, in brief, are the facts agreed to upon this point, so far as they concern the damage to the plaintiff. These facts do not show any peculiar and special damage done to the property of the plaintiff by the defendant, within the meaning of the principles laid down in the *Canastota Knife Co.* case. They show the existence of a very dangerous grade crossing here; dangerous to the plaintiff, to the defendant and to the general public. The plaintiff is undoubtedly hindered and delayed in its business and put to expense by reason of the existence of such a crossing; but that delay and expense is caused not by the defendant, specially or primarily, but by the fact that the plaintiff's tracks are laid across a public highway, the use of which by the general public becomes greater every year. I agree that this grade crossing should be abolished as soon as possible, but the fact that it exists is no reason why, upon the agreed facts, the defendant should be enjoined from operating its street railway there.

In this opinion PRENTICE, J., concurred.

Application for leave to file a motion for reargument was made July 23d and denied July 26th, 1898.